# ANTOINE *v.* BYERS & ANDERSON, INC., ET AL.

Argued March 30, 1993—Decided June 7, 1993

*M. Margaret McKeown* argued the cause for petitioner. With her on the briefs was *Alice D. Leiner.*

*William P. Fite* argued the cause for respondents. With him on the brief for respondent Ruggenberg was *Mark*

*M. Miller.* *Tyna Ek* filed a brief for respondent Byers & Anderson, Inc.*

JUSTICE STEVENS delivered the opinion of the Court.

This case presents the question whether a court reporter is absolutely immune from damages liability for failing to produce a transcript of a federal criminal trial.

## I

In March 1986, after a 2-day trial, a jury convicted petitioner of bank robbery. Petitioner promptly appealed and ordered a copy of the transcript from respondent Ruggenberg, who had served as the court reporter. The court ordered Ruggenberg to produce a transcript by May 29, 1986.

Over two years later, Ruggenberg had yet to provide a transcript, despite a long series of hearings, court orders, and new filing deadlines. In July 1988, Ruggenberg finally explained that she had lost many of her trial notes, though additional notes and tapes were later to come to light. At one point in the proceedings, Ruggenberg was fined and arrested as the Court of Appeals sought to obtain this and other overdue transcripts. Eventually, making use of Ruggenberg's partial notes and materials submitted by the parties pursuant to Rule 10(c) of the Federal Rules of Appellate Procedure,[1] another reporter produced a partial transcript

---

*Denise Meyer, Michael J. Brennan, Dennis E. Curtis, Judith Resnik,* and *Charles D. Weisselberg* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

*Jeffrey P. Altman* filed a brief for the National Court Reporters Association as *amicus curiae* urging affirmance.

[1] Federal Rule of Appellate Procedure 10(c) provides in relevant part:

"*Statement on the evidence or proceedings when no report was made or when the transcript is unavailable.*—If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection."

and the appellate process went forward. As a result of the delay in obtaining a transcript, petitioner's appeal was not heard until four years after his conviction. 950 F. 2d 1471, 1472–1473 (CA9 1991); No. C88–260TB (WD Wash., Feb. 16, 1990), pp. 2–3, reprinted in App. 24.

In 1990, the Court of Appeals set aside petitioner's conviction and remanded the case to the District Court to determine whether petitioner's appeal had been prejudiced by the lack of a verbatim transcript, and whether the delay in receiving the transcript violated petitioner's constitutional right to due process. *United States* v. *Antoine,* 906 F. 2d 1379 (CA9). The District Court ruled against petitioner on both issues and reinstated his conviction. No. C85–87T (WD Wash., Aug. 21, 1991), reprinted in App. 45. The Court of Appeals then affirmed. 967 F. 2d 592 (CA9 1992) (judgt. order), reprinted in App. 66.

In the meantime, before the Court of Appeals disposed of his first appeal in 1990, petitioner filed this civil action, seeking damages from Ruggenberg and respondent Byers & Anderson, Inc., the firm that had engaged her pursuant to its contract to provide reporting services to the District Court. Following discovery, the District Court granted summary judgment in favor of respondents on the ground that they were entitled to absolute immunity. Petitioner's pendent state-law claims were dismissed on jurisdictional grounds. No. C88–260TB, *supra,* reprinted in App. 23.

Without reaching questions of liability or damages, the Court of Appeals affirmed.[2] Reasoning that judicial immu-

---

[2] In addition to state-law claims, petitioner's complaint had alleged a violation of 42 U. S. C. § 1983. Noting that petitioner's state-law claims had been dismissed on jurisdictional grounds, and that § 1983 does not provide a basis for suit against federal agents, the Court of Appeals assumed that the complaint alleged facts sufficient to support a federal claim like that recognized in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971). 950 F. 2d 1471, 1473–1474 (CA9 1991). Because the only question presented by the certiorari petition relates to the absolute immu-

nity is "justified and defined by the functions it protects and serves," *Forrester* v. *White*, 484 U. S. 219, 227 (1988) (emphasis omitted), and that "the tasks performed by a court reporter in furtherance of her statutory duties are functionally part and parcel of the judicial process," the Court of Appeals held that actions within the scope of a reporter's authority are absolutely immune. 950 F. 2d, at 1475–1476.

Some Circuits have held that court reporters are protected only by qualified immunity.[3] We granted certiorari to resolve this conflict. 506 U. S. 914 (1992).

## II

The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity.[4] In determining which officials perform functions that might justify a full exemption from liability, "we have undertaken 'a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it.'" *Butz* v. *Economou*, 438 U. S. 478, 508 (1978) (quoting

---

nity defense on which the Court of Appeals based its decision, see Pet. for Cert. i, we have no occasion to comment on the validity of petitioner's underlying cause of action.

[3] See *McLallen* v. *Henderson*, 492 F. 2d 1298, 1299–1300 (CA8 1974); *Slavin* v. *Curry*, 574 F. 2d 1256, 1265–1266 (CA5 1978); *Green* v. *Maraio*, 722 F. 2d 1013, 1018 (CA2 1983). The Seventh Circuit, like the Ninth, provides absolute immunity for court reporters. *Scruggs* v. *Moellering*, 870 F. 2d 376, 377, cert. denied, 493 U. S. 956 (1989).

[4] We have consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." *Burns* v. *Reed*, 500 U. S. 478, 486–487 (1991) (internal quotation marks and citations omitted).

*Imbler* v. *Pachtman,* 424 U. S. 409, 421 (1976)); see also *Burns* v. *Reed,* 500 U. S. 478, 485 (1991).[5]

The skilled, professional court reporter of today was unknown during the centuries when the common-law doctrine of judicial immunity developed. See generally Ratteray, Verbatim Reporting Comes of Age, 56 Judicature 368 (1973). It was not until the late 19th century that official court reporters began to appear in state courts. *Id.,* at 368–369. Prior to enactment of the Court Reporter Act in 1944,[6] the federal system did not provide for official court reporting.[7] Court reporters were not among the class of persons protected by judicial immunity in the 19th century.[8]

---

[5] For purposes of immunity, we have not distinguished actions brought under 42 U. S. C. § 1983 against state officials from *Bivens* actions brought against federal officials. See *Butz* v. *Economou,* 438 U. S. 478, 503–504 (1978).

[6] 58 Stat. 5, as amended, 28 U. S. C. § 753.

[7] In a case decided in 1942, we pointed out:

"There is no law of the United States creating the position of official court stenographer and none requiring the stenographic report of any case, civil or criminal, and there is none providing for payment for the services of a stenographer in reporting judicial proceedings. The practice has been for the parties to agree that a designated person shall so report. The one selected must be paid by private arrangement with one or more of the parties to the litigation. The amount paid to him is not costs in the cause nor taxable as such against any of the parties." *Miller* v. *United States,* 317 U. S. 192, 197.

[8] "Judicial Immunity . . . was an absolute immunity from all claims relating to the exercise of judicial functions. See, *e. g.,* T. Cooley, Law of Torts 408–409 (1880). It extended not only to judges narrowly speaking, but to 'military and naval officers in exercising their authority to order courts-martial for the trial of their inferiors, or in putting their inferiors under arrest preliminary to trial; . . . to grand and petit jurors in the discharge of their duties as such; to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of taxes; to commissioners appointed to appraise damages when property is taken under the right of eminent domain; to officers empowered to lay out, alter, and discontinue highways; to highway officers in deciding that a person claiming exemp-

Faced with the absence of a common-law tradition involving court reporters themselves, respondents urge us to treat as their historical counterparts common-law judges who made handwritten notes during trials. We find the analogy unpersuasive. The function performed by judicial notetakers at common law is significantly different from that performed by court reporters today. Whereas court reporters are charged by statute with producing a "verbatim" transcript of each session of the court, for inclusion in the official record, 28 U. S. C. § 753(b), common-law judges exercise discretion and judgment in deciding exactly what, and how much, they will write. Early judicial notetakers, for instance, left records from which the "narrative of the trial cannot be reconstructed"; their notes were for their own purposes in charging the jury and were never entered into the public record. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources, 50 U. Chi. L. Rev. 1, 5–6 (1983).[9]

---

tion from a road tax is not in fact exempt, or that one arrested is in default for not having worked out the assessment; to members of a township board in deciding upon the allowance of claims; to arbitrators, and to the collector of customs in exercising his authority to sell perishable property, and in fixing upon the time for notice of sale.' *Id.*, at 410–411 (footnotes omitted).

"As is evident from the foregoing catalog, judicial immunity extended not only to public officials but also to private citizens (in particular jurors and arbitrators); the touchstone for its applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns* v. *Reed*, 500 U. S., at 499–500 (SCALIA, J., concurring in judgment in part and dissenting in part).

[9] Indeed, the doctrine of judicial immunity was recognized in part to avoid imposing on judges the obligation to make complete trial transcripts.

"If upon such allegations a judge could be compelled to answer in a civil action for his judicial acts, not only would his office be degraded and his usefulness destroyed, but he would be subjected for his protection to the necessity of preserving a complete record of all the evidence produced before him in every litigated case, and of the authorities cited and arguments presented, in order that he might be able to show to the judge before whom he might be summoned by the losing party . . . that he had

There is a second problem with respondents' theory. Even had common-law judges performed the functions of a court reporter, that would not end the immunity inquiry. It would still remain to consider whether judges, when performing that function, were themselves entitled to absolute immunity. We do not doubt that judicial notetaking as it is commonly practiced is protected by absolute immunity, because it involves the kind of discretionary decisionmaking that the doctrine of judicial immunity is designed to protect. But if we could imagine a hypothetical case in which a common-law judge felt himself bound to transcribe an entire proceeding verbatim, it is far less clear—and neither respondent refers us to any case law suggesting—that this administrative duty would be similarly protected. Indeed, we have recently held that judges are not entitled to absolute immunity when acting in their administrative capacity. *Forrester* v. *White*, 484 U. S. 219, 229 (1988).

We are also unpersuaded by the contention that our "functional approach" to immunity, see *Burns* v. *Reed*, 500 U. S., at 486, requires that absolute immunity be extended to court reporters because they are "part of the judicial function," see 950 F. 2d, at 1476. The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability.[10] Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolv-

---

decided as he did with judicial integrity . . . ." *Bradley* v. *Fisher*, 13 Wall. 335, 349 (1872).

[10] "For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful." *Id.*, at 347. See also *Mireles* v. *Waco*, 502 U. S. 9, 10 (1991), and cases cited therein.

ing disputes between parties, or of authoritatively adjudicating private rights." 500 U. S., at 500 (SCALIA, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges—that is, because they, too, "exercise a discretionary judgment" as a part of their function. *Imbler* v. *Pachtman*, 424 U. S., at 423, n. 20. Cf. *Westfall* v. *Erwin*, 484 U. S. 292, 297–298 (1988) (absolute immunity from state-law tort actions available to executive officials only when their conduct is discretionary).

The function performed by court reporters is not in this category. As noted above, court reporters are required by statute to "recor[d] verbatim" court proceedings in their entirety. 28 U. S. C. § 753(b). They are afforded no discretion in the carrying out of this duty; they are to record, as accurately as possible, what transpires in court. See *McLallen* v. *Henderson*, 492 F. 2d 1298, 1299 (CA8 1974) (court reporters not absolutely immune "because their duties are ministerial, not discretionary, in nature"); *Waterman* v. *State*, 35 Misc. 2d 954, 957, 232 N. Y. S. 2d 22, 26 (Ct. Cl. 1962), aff'd in part, rev'd in part, 241 N. Y. S. 2d 314 (4th Dept., App. Div. 1963) (same).[11] We do not mean to suggest that the task is less than difficult, or that reporters who do it well are less than highly skilled. But the difficulty of a job does not by itself make it functionally comparable to that of a judge. Cf. *Malley* v. *Briggs*, 475 U. S. 335, 342 (1986) (police officer not entitled to absolute immunity for conduct involved in applying for warrant). Nor is it sufficient that the task of a court reporter is extremely important or, in the words of the

---

[11] "A court stenographer, notwithstanding the fact that he is an officer of the court, by the very nature of his work performs no judicial function. His duties are purely ministerial and administrative; he has no power of decision. The doctrine [of judicial immunity] has no application to the facts with which we are confronted here." *Waterman*, 35 Misc. 2d, at 957, 232 N. Y. S. 2d, at 26.

Court of Appeals, "indispensable to the appellate process." 950 F. 2d, at 1476. As we explained in *Forrester*, some of the tasks performed by judges themselves, "even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts." 484 U. S., at 228. In short, court reporters do not exercise the kind of judgment that is protected by the doctrine of judicial immunity.

Finally, respondents argue that strong policy reasons support extension of absolute immunity to court reporters. According to respondents, given the current volume of litigation in the federal courts, some reporters inevitably will be unable to meet deadlines. Absolute immunity would help to protect the entire judicial process from vexatious lawsuits brought by disappointed litigants when this happens. Requiring court reporters to defend against allegations like those asserted here, on the other hand, would not only be unfair, but would also aggravate the problem by contributing further to the caseload in the federal courts.

Assuming the relevance of respondents' policy arguments, we find them unpersuasive for three reasons. First, our understanding is that cases of this kind are relatively rare. Respondents have not provided us with empirical evidence demonstrating the existence of any significant volume of vexatious and burdensome actions against reporters, even in the Circuits in which reporters are not absolutely immune. See n. 3, *supra*. Second, if a large number of cases does materialize, and we have misjudged the significance of this burden, then a full review of the countervailing policy considerations by the Congress may result in appropriate amendment to the Court Reporter Act. Third, and most important, we have no reason to believe that the Federal Judiciary, which surely is familiar with the special virtues and concerns of the court reporting profession, will be unable to administer justice to its members fairly.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*