**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

R. M. BELL,

      Plaintiff - Appellant,

v.

JAMES R. MANSPEAKER, as Clerk
of District Court; DENVER POLICE
DEPARTMENT; THOMAS FISHER,
individually and as an Officer of the
Denver Police Department,

      Defendants - Appellees.

No. 00-1415
(D.C. No. 98-WY-862-CB)
(D. Colorado)

---

**ORDER AND JUDGMENT**   *

---

Before **HENRY** , **ANDERSON** , and **LUCERO** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Defendant-appellant R.M. Bell brought suit under 42 U.S.C. § 1983 against James Manspeaker, the clerk of the United States District Court for the District of Colorado, and Thomas Fisher, an officer in the Denver Police Department, for conspiracy to deny his constitutional rights. [1] Mr. Bell's action arose out of an incident that occurred outside the federal courthouse in Denver on the day of opening argument in the Timothy McVeigh trial.

The district court dismissed the claims against Mr. Manspeaker as barred by absolute immunity; Mr. Fisher was granted summary judgment on the basis of qualified immunity. After de novo review, we affirm. [2]

## I. BACKGROUND

### A. Mr. Manspeaker

As one of his duties as the clerk of the district court charged with conducting the Timothy McVeigh trial, Mr. Manspeaker oversaw a credentialing procedure designed to screen members of the press and the public who wished to

---

[1] Mr. Bell named other defendants who have been dismissed from this suit and are not the subject of this appeal. He also brought various state claims which are likewise not at issue here.

[2] Mr. Bell has filed a motion to admit the hearing transcript of Scott Tuttle. The transcript of the "hearing" was apparently done by an independent word processor and bears no indicia of authenticity. Further, it is replete with question marks indicating that the person transcribing from the original medium could not fully understand all that had transpired. This motion is DENIED.

view the trial.  Mr. Bell applied for press credentials claiming to be an

international correspondent for Golden Bell Press, a Denver printing company.[3]

As part of the credentialing process, the federal officials ran a standard

background check on Mr. Bell which revealed a history of arrests and convictions,

including arrests for mob action and possession of explosives and convictions for

shoplifting and burglary.  The background check also revealed that Mr. Bell had

been temporarily committed to a mental health facility in Denver for a

psychological evaluation.  Federal officials forwarded this information to the

Denver Police Department.

Mr. Bell was denied press credentials but apparently was able to view the

trial on the day of the opening arguments as a member of the public.  To do this,

Mr. Bell checked in with the clerk's office and listened to the trial in an overflow

courtroom.

B.  Mr. Fisher

Three law enforcement agencies coordinated efforts to provide security for

the McVeigh trial.  Mr. Fisher supervised the Denver Police Department's part of

that effort.  On April 24, 1997, after the trial had recessed for lunch, Mr. Fisher

---

[3]     Contrary to Mr. Bell's contention in his reply brief, information about
Mr. Bell's connection with Golden Bell Press and his claim of employment with
that firm was elicited by the court in a hearing held on September 11, 2000.     *See*
R. Supp. Vol. I at 6-8.

and several other Denver police officers approached Mr. Bell who had just exited the courthouse front door and was walking in front of the courthouse. Mr. Fisher indicated that he had been in contact with Mr. Manspeaker and requested to speak with Mr. Bell. Mr. Bell agreed to be questioned. In view of the gathered media, officers other than Mr. Fisher then handcuffed Mr. Bell, placed him in a patrol car, and drove him to a location approximately two blocks from the courthouse. [4] There, Mr. Bell was questioned by Mr. Fisher, photographed and released. The entire encounter took less than thirty minutes.

## II. DISCUSSION

### A. Mr. Manspeaker

Finding that Mr. Manspeaker had been delegated by Judge Matsch, the presiding judge at the McVeigh trial, to coordinate security for the trial, the district court granted Mr. Manspeaker absolute immunity from any civil liability in connection with that role. We review this conclusion de novo. *Gagan v. Norton*, 35 F.3d 1473, 1475 (10th Cir. 1994), and we affirm.

Absolute immunity "free[s] the *judicial process* from the harassment and intimidation associated with litigation." *Burns v. Reed*, 500 U.S. 478, 494 (1991) (emphasis in original). As the official seeking absolute immunity,

---

[4] There is no evidence, nor does Mr. Bell contend, that Mr. Fisher ordered the handcuffing.

Mr. Manspeaker must convince the court that the function he performed on the day in question should be protected by immunity. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 n.4 (1993). The Supreme Court has emphasized that, ordinarily, qualified immunity is sufficient to shield officials in the performance of their public duties. *Id.* The Court has been "quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant." *Id.*

Whether the doctrine is applicable depends on the function performed by the one seeking immunity. Courts look to the

> performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights. When judicial immunity is extended to officials other than judges, it is because their judgments are functionally comparable to those of judges – that is, because they, too, exercise a discretionary judgment as a part of their function.

*Id.* at 435-36 (quotations and alterations omitted). The focus is on the judicial process and the immunity-seeker's role in that process. *See Burns,* 500 U.S. at 493-94. We examine the nature and function of the act in question, not the act per se. *Mireles v. Waco*, 502 U.S. 9, 13 (1991). "In other words, we look to the particular act's relation to a general function normally performed by a judge . . . ." *Id.*

In *Mireles*, the Ninth Circuit had reversed the grant of absolute immunity to a judge accused of ordering police to use excessive force to bring a public

-5-

defender into his courtroom. *Id.* at 11. Finding that directing police officers to bring counsel in a pending case before him was a function normally performed by a judge, the Supreme Court reversed. *Id.* at 13. The Court noted that the fact that the judge's order was carried out by police officers did not transform the act from a judicial one to an executive one. "[I]t is the nature of the function performed, not the identity of the actor who performed it, that informs our immunity analysis." *Id.* (quotation and alteration omitted).

We agree with the district court that Mr. Manspeaker's role in controlling access to the courtroom during the McVeigh trial was an integral part of the judicial process deserving the protection of absolute immunity. "[T]he courtroom and courthouse premises are subject to the control of the court." *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966); *see also Martinez v. Winner*, 771 F.2d 424, 434 (10th Cir. 1985) (noting judge's responsibility for security during trial), *judgment vacated as moot*, 800 F.2d 230 (1986); *Snow v. Oklahoma*, 489 F.2d 278, 280 (10th Cir. 1973) (relegating type and necessity of security precautions to judge's discretion).

The district court took judicial notice of the fact that Mr. Manspeaker was responsible for coordinating security during the Oklahoma City bombing trials. [5]

---

[5] Mr. Bell does not object to the judicial notice taken by the district court. He does, however, object to additional newspaper articles cited by

(continued...)

-6-

The district court implicitly found that the presiding judge had delegated that responsibility to Mr. Manspeaker. As such, Mr. Manspeaker was clothed with the same absolute immunity that would cloak the judge. *Whitesel v. Sengenberger,* 222 F.3d 861, 867 (10th Cir. 2000) ("'Immunity which derives from judicial immunity may extend to persons other than a judge where performance of judicial acts or activity as an official aid of the judge is involved.'" (quoting *Henriksen v. Bentley*, 644 F.2d 852, 855 (10th Cir. 1981) (alterations omitted)).

Further, Mr. Manspeaker's role in coordinating security involved a high degree of discretion. *See id.* at 869 (noting that "absolute immunity generally extends to non-judicial officers performing discretionary judicial acts"). Because the power to control court security is essential to the court's dispute resolution function, Mr. Manspeaker is entitled to absolute immunity for his actions taken pursuant to that function. *See Valdez v. City & County of Denver*, 878 F.2d 1285, 1290 (10th Cir. 1989) (reversing district court's refusal to grant absolute immunity to law enforcement officials who were acting under direction of state court judge when they arrested plaintiff for contempt); *see also Rodriguez v.*

---

[5](...continued)
Mr. Manspeaker in his brief to this court. While this court may also take judicial notice on appeal, *see* Fed R. Evid. 201(f), we restrict our analysis to the materials noticed by the district court.

*Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) (holding judges and support staff absolutely immune from acts associated with control of court docket).

Courts have specifically extended absolute immunity to court clerks under a variety of circumstances. *See Rodriguez*, 116 F.3d at 67 (affirming grant of immunity for harms allegedly wrought by clerk's delay in scheduling appeal); *Slotnick v. Garfinkle*, 632 F.2d 163, 166 (1st Cir. 1980) (same for charge that clerk conspired with others to have plaintiff committed to mental institution). This court has recognized the availability of absolute immunity to court clerks who perform "quasi-judicial" duties. *See Henriksen,* 644 F.2d at 855; *McKinney v. Oklahoma Dep't of Human Servs.,* 925 F.2d 363, 365 (10th Cir. 1991) (recognizing judicial immunity for court clerk for alleged civil rights violations arising out of felony and juvenile proceedings).

Because Mr. Manspeaker had been delegated responsibility for security during the McVeigh trial, a task involving significant judgment and discretion, we affirm the grant of absolute immunity to him by the district court.

Mr. Bell argues that the district court erred in refusing to allow him to amend his complaint against Mr. Manspeaker for the second time. Because Mr. Manspeaker is absolutely immune from any liability to Mr. Bell based on the incident here, amendment would have been futile. The district court was well

within its discretion in denying leave to amend. *See Scott v. Hern*, 216 F.3d 897, 906 (10th Cir. 2000).

B.  Mr. Fisher

The district court granted Mr. Fisher summary judgment on the basis of qualified immunity.  We review the grant of summary judgment using the same standard as the district court.  *Id.*  Because Mr. Fisher relied on the qualified immunity defense, we first review to determine whether, taken in the light most favorable to Mr. Bell, Mr. Bell has demonstrated that Mr. Fisher's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001). [6] Assuming that the allegations could be proven, if no constitutional right has been abridged, our inquiry is at an end, *id.,* and the defendant is accorded qualified immunity.

Under the facts alleged here, it is clear that Mr. Bell was seized.  The question is whether that seizure was unreasonable for Fourth Amendment purposes.

Mr. Bell contends that he was arrested without probable cause.  We view the facts, however, as sufficient only to establish that Mr. Bell was the subject of

---

[6]  In his brief, Mr. Fisher implies that Mr. Bell must meet a heightened pleading requirement in responding to the qualified immunity defense.  We note that such is no longer the law of this circuit.  *See Currier v. Doran*, 242 F.3d 905, 916 (10th Cir.), *cert. denied*, 122 S. Ct. 543 (2001).

a brief detention valid under *Terry v. Ohio*, 392 U.S. 1 (1968), and acceptable where the officers have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the stop]." *Id.* at 21. "Reasonableness is determined by balancing the governmental interest in crime prevention against the citizen's right to be free from governmental intrusion." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

Here, the government's interest in maintaining security at the trial of someone accused of bombing a federal courthouse cannot be overstated. Further, Mr. Bell's criminal and psychological history were known to Mr. Fisher, including the fact that Mr. Bell had been arrested for possession of explosives and mob violence and that he had spent time in a psychiatric treatment facility in Denver. Mr. Bell had been observed "acting strange[ly]" outside the courthouse. Appellant's App. at 88. In addition, Mr. Bell consented to being questioned by Mr. Fisher.

Mr. Bell argues that, despite his consent to questioning, he did not consent to being handcuffed and transported from the courthouse area in a police car. Mr. Fisher maintains that Mr. Bell was transported away from the courthouse to avoid the scrutiny of the gathered media, Appellant's App. at 88, and points out that police department policy requires that "individuals who present a potential threat be handcuffed while being transported in a police vehicle," see *id.* at 208. We

-10-

find that, given the circumstances and the government interest in maintaining security, these actions were reasonable.

"While *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures." *Perdue*, 8 F.3d at 1462-63 (holding that drawing of weapons by police and requiring suspect to lay face down on the ground did not elevate an otherwise lawful *Terry* stop to the level of an arrest). We acknowledge that this is a close question here because Mr. Bell did not do anything provocative at the time of the encounter to indicate potential danger to the officers. Nevertheless, the officers knew of Mr. Bell's criminal and psychological history and could reasonably be concerned for their safety. Under these circumstances, we do not find the handcuffing to have changed the nature of this brief detention into one requiring Fourth Amendment protections. Similarly, the transportation two blocks away from the courthouse and away from the glare of the media was taken to minimize the impact of the incident on Mr. Bell in keeping with the requirement that *Terry* stops be as nonintrusive as possible.

The scope of a *Terry* stop must be limited to correspond to the reason justifying the stop. *Id.* at 1462. Here, the entire incident took less than thirty minutes after which Mr. Bell was released and was free to return to the courthouse. We hold that, given the government's interest in providing security

for the McVeigh trial, this intrusion into Mr. Bell's freedom was insufficient to constitute an arrest with the attendant requirement of probable cause. Mr. Bell's Fourth Amendment right to be free from unreasonable seizure, therefore, is not implicated. Because, on the facts alleged, no constitutional right was violated Mr. Fisher was properly accorded qualified immunity. *See Saucier*, 533 U.S. at 201.

Alternatively, even if an unreasonable seizure had occurred here, the next inquiry is "whether it would be clear to a reasonable officer that Mr. Fisher's conduct was unlawful in the situation he confronted." *Id.* at 202.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here [probable cause for arrest], will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether [such facts constitute probable cause]. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 205.

At the time he stopped Mr. Bell, Mr. Fisher knew of Mr. Bell's long criminal history including arrests for mob violence and possession of explosives. He was also aware of Mr. Bell's mental health history, his strange behavior outside the courthouse, and the need to provide extra-vigilant security around the McVeigh trial. A reasonable officer in Mr. Fisher's position could have believed that detaining Mr. Bell, handcuffing

him briefly, and transporting him away from the courthouse was within the ambit of acceptable police responses. *See id.* at 208.

The judgment of the United States District Court for the District of Colorado is AFFIRMED.

Entered for the Court


Robert H. Henry
Circuit Judge