## In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

### No. 02–41729 (REG).

United States Bankruptcy Court, S.D. New York.

Aug. 18, 2006.

Kronish Lieb Weiner & Hellman LLP by Ronald R. Sussman, Esq. (argued), James A. Beldner, Esq., Jeffrey L. Cohen, Esq., New York, NY, for the Fee Committee.

Schulte Roth & Zabel LLP by Alan. R. Glickman, Esq. (argued), Michael L. Cook, Esq. David M. Hillman, Esq., New York, NY, for Boies, Schiller & Flexner LLP.

Kasowitz Benson Torres & Friedman LLP by Jennifer B. Schwarz, Esq., New York, NY, for the Official Committee of Unsecured Creditors.

Willkie Farr & Gallagher LLP by Morris J. Massel, Esq., New York, NY, for the Debtors.

## DECISION AND ORDER ON FEE COMMITTEE MOTION FOR PROTECTIVE ORDER

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the jointly administered chapter 11 cases of Debtors Adelphia Communications Corporation and its affiliates (the "Debtors"), I have before me the Fee Committee's motion, pursuant to Fed. R. Bankr.P. 7026 and Fed.R.Civ.P. 26(c), for a protective order.

The Fee Committee, which consists of representatives of Adelphia, the official Creditors' and Equity Committees in these cases, and the United States Trustee ("UST"), was established under an earlier order I entered early in the Adelphia cases to help keep professional fees under control, and to assist me in fee review. The Fee Committee has also undertaken the investigation of the circumstances surrounding the use by the Debtors' former special counsel, Boies, Schiller & Flexner ("BSF"), on behalf of the Debtors, of two vendors of litigation support services in which family members of David Boies, a member of BSF, had an interest, and whose use led to BSF's resignation. BSF now has a final fee application pending before me, to which the Fee Committee may object, though it has not yet done so. Upon denying a motion to appoint an examiner to look into the allegations concerning the use of those vendors, I authorized the parties in interest in these cases, and the Fee Committee, to investigate the circumstances surrounding the use of the vendors, and to engage in any necessary discovery.

While submitting to the discovery requested by the Fee Committee with respect to those issues, BSF has also sought discovery from the Fee Committee, focused on one of the several issues that underlie this controversy—whether, apart from any need for disclosure of the use of affiliated vendors, the vendors overcharged for their services. BSF, which contends that the vendors' services were provided at or below prevailing market rates, contends that the Fee Committee considered the reasonableness of the charges for the vendors' services at an earlier time, and that facts learned, and/or conclusions reached, by the Fee Committee may be relevant to the overcharging claims.

BSF seeks discovery from the Fee Committee and the Fee Committee's agents to harvest that information. But the Fee Committee points to provisions in the Protocol that I had approved in my earlier order establishing the Fee Committee which it contends grant it an immunity from discovery. A section captioned "Committee Exculpation and Indemnification" provided:

> The Fee Committee and each member thereof are hereby appointed officers of the Court with respect to the performance of their duties on the Fee Committee and provided the maximum immunity permitted by law from civil actions for all acts taken or omitted in the performance of their duties and powers on the Fee Committee.

The Fee Committee also contends that it "is not a party to the contested matter relative to BSF's final fee application," and implies that it should be protected from discovery for this reason as well.

As the Fee Committee properly observes,[1] there is now essentially no caselaw on the role and rights of fee committees. The controversy here is one of first impression. As a result, I am laying out my conclusions, rationale, and related concerns, supplementing the "bottom line" rulings I announced at the conclusion of the hearing, in writing.

As conclusions of law, I rule:

(1) The "maximum immunity permitted by law from civil actions" that was afforded to the Fee Committee under the Protocol—and separately, the nature of a fee committee's appointment and responsibilities—provides immunity from suit. But neither additionally provides immunity from otherwise proper discovery requests;

(2) I do not need to decide whether the Fee Committee is a "party" to the contested matter, because the Fee Committee would be subject to otherwise appropriate discovery requests whether or not it is a party;

(3) Matters as to the applicability of other potential discovery exceptions—work product, attorney mental impressions and attorney-client privilege—are not yet ripe for decision. Determinations as to such matters should await other events, efforts to get the information from other sources, and more extensive factual presentations.

For these reasons, I am determining that while discovery of the Fee Committee

is not prohibited as a matter of law, it should await the filing of an objection to the BSF fee application (by the Fee Committee or anyone else), and should await resort to other sources from which the relevant information might be obtained.

*Facts*

*1. The Fee Committee Protocol*

In June 2002, most of the Debtors filed voluntary petitions for relief under chapter 11 of the Code. By reason of the size and complexity of the case, a large number of professionals were employed by the Debtors, the Creditors' Committee, and the Equity Committee. To help manage the costs of the large number of retained professionals involved (many of whom were working very intensely, at a corresponding cost), I approved the formation of a fee committee in early 2003. The appointment of a fee committee has become increasing common in large chapter 11 cases.[2]

The Debtors, committees and UST jointly developed a "Fee Committee and Free Procedures Protocol" under which the Fee Committee would operate. On March 7, 2003, I entered an order approving the Protocol, and authorizing the formation of the Fee Committee. The Fee Committee is comprised of four members—one representative each from the Debtors, the Creditors' Committee, the Equity Committee, and the UST.

The Protocol provides that the Fee Committee shall "review and analyze fee

---

**1.** *See* Fee Comm. Reply at ¶ 10 ("In its infant stages in this district and around the country, Fee Committees simply have not been in existence long enough to build a caselaw foundation specific to their operations").

**2.** Other judges in this district, and I, have appointed fee committees in recognition of the reality that large chapter 11 cases tend to be complex and litigious, and that in no small part as a consequence, the professional fees

tend to be sizeable. Large chapter 11 cases require such measures as are practicable to keep fees to a minimum. I normally seek to appoint business person members of fee committees, designated by major stakeholders, to join representatives of the UST. Such business people typically have the ability to balance the natural desire to keep fees as low as possible with an understanding of the needs and complexities of the case.

statements and interim and final fee applications submitted by professionals appointed by this Court ... and verify compliance with the other procedures described herein."[3] The Fee Committee assesses fee requests for reasonableness, and also considers a number of other things, such as compliance with the UST Fee Guidelines and this district's Local Rules. The Fee Committee also reviews budgets submitted by professionals with respect to contemplated services, and compares the fee requests to the previously submitted budgets. If the Fee Committee has concerns as to fees (such as requests for fees over budget), it may contact the professional to discuss them. And it may, if it concludes such is necessary, also issue a "Fee Committee Statement" with respect to the Fee Dispute, after which the Fee Committee and professional similarly endeavor to reach a mutually acceptable resolution of issues raised by the Fee Committee.[4]

The Protocol goes on to provide that:

In the event that the Fee Committee and the Retained Professional cannot reach a resolution with respect to the issues raised by the Fee Committee Statement within a reasonable period of time (which shall not exceed 45 days), such disputed portion of the fee statement or fee applications may be submitted by the Retained Professional to the Court for resolution.[5]

Under certain circumstances, a member of the Fee Committee may act as a witness (and as an expert witness) when the matter comes before the Court.[6] And the Fee Committee, normally by its counsel, will be heard on any objection to a fee request.

To my understanding, many issues that might have otherwise resulted in objections to fees have been consensually resolved, after discussions between the Fee Committee and the professionals involved.[7] Fee disputes are narrowed or eliminated with the knowledge—obvious to both sides—that if the disputes are not consensually resolved, the Fee Committee will object to the fees. But the Fee Committee does not actually approve or disapprove the fees; that is a function of the Court. On occasion, though rarely, a fee dispute has come before me and the Fee Committee has recommended a reduction in fees, and in the only such instance I can recall, I concurred with the Fee Committee's recommendation, after argument by both sides on the issue.

As noted above, the Protocol approved by this Court appointed the Fee Committee as an "officer[ ] of the Court," and "provided the maximum immunity permitted by law from civil actions...."[8] That

---

3. Fee Committee Protocol at 1.

4. *Id.* at 4. Pending that resolution (this being in the context of the order entered early in this case providing for interim fee payments to professionals), the Debtors continue to compensate the professional for amounts that are undisputed, but hold back any disputed amounts.

5. *Id.*

6. *Id.* ("Upon request of the Court, any member of the Fee Committee duly authorized by the Fee Committee, on behalf of the Fee Committee, may act as an expert witness only with respect to (i) any Fee Committee Statement issued in relation to the Fee Dispute, (ii) any objection to such Fee Committee Statement and (iii) the fee applications or statements implicated thereby.").

7. It is possible that I have incomplete knowledge with respect to this, as by definition any controversies in that regard do not come before the Court. I hear of these, most commonly, when on fee applications for reduced amounts, counsel for the Fee Committee notes that professionals have after such discussions modified their requests.

8. Other aspects of the protection granted to the Fee Committee—that the matters at issue here involved the performance of Fee Committee Duties, and actions taken or omitted

protects the Fee Committee and its members from retaliation by professionals who might be disgruntled with Fee Committee actions or recommendations.

### 2. The Work of the Fee Committee

The Fee Committee commenced its work in May 2003. It retained Legal Cost Control, Inc. ("LCC") as a fee auditor in June 2003. It also retained counsel, in November 2003. From its formation to the present, the Fee Committee has reviewed approximately $400 million in aggregate fees and expenses billed to the Debtors' estates by retained professionals in these cases.[9]

### 3. The BSF Fee Dispute

From June 2002 through August 2005, BSF served as Adelphia's special counsel, focusing principally on prosecuting Adelphia's multi-billion dollar actions against the Rigases and Deloitte & Touche, Adelphia's former auditors; defending a multi-billion dollar claim by the SEC; and addressing the DoJ's threat to indict Adelphia as a company, all as a consequence of the Rigas fraud.

In connection with this representation, BSF utilized the services of Amici, a document management vendor, which was tasked with managing documents in the litigation and investigations in which BSF was involved on behalf of Adelphia. Most of the fees for this engagement were set in an October 2003 agreement between Adelphia and Amici. BSF contends that the Fee Committee was directly involved in negotiations with Amici in 2003 to determine these fees, and that the Fee Committee, its fee auditor LCC, and the UST conducted their own review of "compara-

ble" market alternatives and rates by examining options approved in the *Enron* and *WorldCom* bankruptcy cases for similar document management services. BSF also contends that the Fee Committee and the UST believed that Amici's rates were "reasonable."

In August 2005, BSF disclosed to the Court that family members of David Boies and other BSF attorneys held investment interests in Amici and in Echelon, another vendor used by BSF during its representation of Adelphia. At a chambers conference shortly thereafter, I expressed the need for some kind of inquiry or investigation with respect to the underlying facts regarding this disclosure, but I did not then rule on the mechanics. BSF resigned as special counsel for Adelphia. On October 3, 2005, BSF filed its Final Fee Application, seeking final approval for approximately $31 million in fees and expenses, for the entirety of the work it performed in these cases, most of which had been paid on an interim basis, shortly after the services were performed, and before the vendor issues surfaced.

In January 2006, the UST, the Creditors' Committee, the Debtors, the Equity Committee and the Fee Committee entered into a stipulation, subject to my approval, which if so ordered would have resulted in the appointment of an examiner to investigate the circumstances relating to BSF's use of the vendors. Upon objections to the stipulation, I deemed it to be a motion for appointment of an examiner, and the matter was argued by the UST and the Fee Committee. On February 6, 2006, in a dictated oral decision, I denied the request for an examiner—believing,

---

here were within the scope of Fee Committee's responsibilities—are not subject to dispute here.

9. These are very considerable sums. But they are in the context of an estate whose assets fetched approximately $17.6 billion on its recent sale.

*inter alia,* that the estate's investigative needs could be accomplished much more economically by other means. One such means was by ordinary discovery in connection with the contested matter triggered by BSF's final fee application—discovery that was available immediately, and as of right, under my Case Management Order # 3.

In accordance with my February 6 ruling, the parties commenced discovery. The Debtors and Creditors' Committee served a subpoena on Amici seeking documents concerning, among other things, whether Adelphia paid market rates for Amici's services. BSF also served discovery requests, including: (i) a document request on the Fee Committee; (ii) a deposition notice on the Fee Committee; and (iii) a document and deposition subpoena on LCC (collectively, the "Discovery Requests").

On June 7, contending that the Fee Committee, its members and its agents were immune from discovery, the Fee Committee asked BSF to withdraw the Discovery Requests. BSF declined, contending that no legal authority supported the Fee Committee's contention, and that immunity should not apply in this context because the Fee Committee was a participant in, and a fact witness to, events relevant to the allegations made against BSF. Subsequent discussions between the parties in an effort to resolve this discovery dispute were unsuccessful.

## Discussion

### I.

BSF is correct in its points [10] that no case has ever held that a fee committee

has a "discovery immunity," and that the Fee Committee has cited none in its motion. Nevertheless, the issue warrants further analysis.

As noted above, the Protocol approved by this Court appointed the Fee Committee as an "officer[ ] of the Court," and "provided the maximum immunity permitted by law from civil actions...." [11] Those clauses, while related, are separate, and I think they initially should be considered separately.

The second clause is more plainly relevant, and I turn to it first. I do not find it to be ambiguous, and thus construe it in accordance with its plain meaning. It provides the maximum immunity permitted by law *from civil actions*—not from discovery requests. That has a clear meaning in the free-standing sense, and particularly since the clause applies not just to the Fee Committee but also to its members, it has a clear meaning in context as well. It was foreseeable, when the Protocol was approved, that members of a Fee Committee might take action or a position that a professional might not like. Fee Committee recommendations or objections could cause a professional's fees to be disallowed, in whole or in part, with actual or perceived injury to the affected professional's income or reputation. It was reasonable, if not essential, to protect members of the Fee Committee from liability for acts performed or positions taken when the Fee Committee was doing its job, and the Fee Committee and its members were protected from civil actions seeking to impose such liability.[12] But seeking discov-

---

10. BSF Br. at 6.

11. Other aspects of the protection granted to the Fee Committee—that the matters at issue here involved the performance of Fee Committee Duties, and actions taken or omitted here were within the scope of Fee Commit-

tee's responsibilities—are not subject to dispute here.

12. In a follow-up sentence in the same paragraph, they also were protected from actions seeking to impose such liability in any court other than this one. This Court, much more

ery of otherwise relevant information from a fee committee is fundamentally different than commencing a civil action against it—or, especially, its members, who would have the legitimate need and concern that they not be held financially responsible for performing tasks the Court requested.

Then I turn to the first clause. There the Protocol also designated the Fee Committee as an "officer of the Court." That—and the fact that the second clause defined the immunity as the "maximum permitted by law"—requires consideration of what "officer of the Court" means, in the context of the appointment of a fee committee. In contrast to the second clause, "officer of the Court" is ambiguous, as it is not defined by statute or any expressly stated definition or cross-reference, and is used in a variety of ways in everyday legal life. Whether "officer of the Court" equates to "judicial officer," and if so, how, is particularly subject to fair debate.

In this connection, while I do not agree with BSF's contention that the Fee Committee is no more of an "officer of the Court" than a lawyer is, I agree with BSF that the Fee Committee is not a judicial officer, or close to one, either. Plainly the Fee Committee performs its function with the authority of the Court. And the Fee Committee's actions may result in a temporary deferral of fee payments to profes-

sionals that presumably would have been made if they were not a matter of controversy. But a fee committee's role is not to make judicial, or quasi-judicial, determinations. In the event of an inability of the Fee Committee and a professional to consensually resolve their differences, "such disputed portion of the fee statement or fee application may be submitted by the Retained Professional to the Court for resolution." [13]

The determination as to whether or not fee requests should be authorized is vested with the bankruptcy court, and not anyone else, by delegated authority or otherwise—not to the UST; not to parties in interest; and not to a fee committee. The Federal Rules of Bankruptcy Procedure do not authorize, or contemplate, masters. And in incorporating the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure conspicuously fail to incorporate Fed.R.Civ.P. 53, which addresses the appointment of masters. A fee committee does not make determinations that are to be made by the Court. Rather, in the large chapter 11 cases where fee committees have been appointed in this district, when disputes arise a fee committee acts as both an advocate and a species of court-appointed expert, to make recommendations to the Court vis-à-vis professionals' requests for fees.[14] As such, a fee commit-

---

than another, would be aware of all relevant facts and circumstances, and of the purpose and construction of the exculpation provisions.

**13.** Protocol at 4.

**14.** That is underscored by the Protocol's provisions establishing the mechanism for fee disputes. If after receipt of a Fee Committee Statement the issues are not consensually resolved, "such disputed portion of the fee statement or fee applications *may be submitted by the Retained Professional to the Court for resolution."* (Protocol at 4; emphasis

added). Under such circumstances, a fee committee representative may be a witness, and indeed an expert witness, but like any other witness, would be subject to cross-examination. Most obviously, the Fee Committee would then be a litigant and/or advocate, and not an adjudicator.

Contrary to BSF's assertion (BSF Br. at 7), the Fee Committee's role is quite a bit more than a "house keeping" function, even though BSF is right in its point that it "is intended to ease the administrative burden on the Court, the Debtors, the UST and the creditors' committees in a substantial chapter 11 case in-

tee's views are seriously considered by the Court—both the facts that the fee committee brings to the table and the opinions it expresses. But a fee committee's views, and opinions, do not rise to the level of judicial determinations, nor do they even carry a presumption of validity. As a case cited by the Fee Committee [15] notes, "the touchstone for [judicial immunity's] applicability [is] performance of the function of resolving disputes between parties, or authoritatively adjudicating private rights." [16] At least when judicial immunity is asserted to include immunity from discovery, the Fee Committee's immunity claim fails to pass muster under that standard.

When we review the cases advanced by the Fee Committee in support of its position, we see that all but two involved, as a substantive matter, immunity from suit (to which the Fee Committee is plainly entitled, and which the Fee Committee already has), and not immunity from discovery. The first, *In re Lickman,* [17] is inapposite because it involved discovery with respect to *judicial* determinations, which we do not have here. [18] The second, *Enron,* involved discovery of an examiner. I agree that an examiner is not a judicial officer (or even a master); is better analogized to a court-appointed expert; [19] and thus that cases involving examiners provide some guidance in cases like this one (and unlike *Lickman*) that do not involve judicial officers. But Judge Gonzalez of this Court did not impose or apply a rule of full discovery immunity, such as the one sought here. Rather, in the one of the multiple decisions he issued on discovery of examiner materials that is most relevant here, [20] he announced, *inter alia,*

---

volving numerous court-appointed professionals seeking significant fees." (*Id.*) It differs from a "house keeping" function because the Fee Committee provides a judgmental input along with major effort in bringing relevant facts, and opinions, to the Court's attention. But that nevertheless does not elevate its effort to a judicial or quasi-judicial determination.

**15.** *See* Fee Committee Reply Br. at 4 n. 3.

**16.** *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 434 n. 8, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993) (citations omitted).

**17.** 304 B.R. 897 (Bankr.M.D.Fla.2004) (Williamson, J.).

**18.** Thus, while I agree with the plainly correct holding and analysis in *Lickman,* I find it inapposite—even though, like Judge Williamson there, I apply a functional approach. Unlike the former bankruptcy judge and his Chambers staff whose acts Judge Williamson considered in *Lickman,* the Fee Committee here was not making judicial or quasi-judicial determinations.

**19.** *See In re Fibermark, Inc.,* 339 B.R. 321 (Bankr.D.Vt.2006) (Brown, J.) In a considerably more extensive discussion, from which these excerpts are distilled, Judge Brown observed:

> While the examiner answers solely to the court and is required to file a report of his or her investigation with the court, *an examiner's findings have no binding effect on the court. . . .*
> [A]n examiner's report is helpful to the court in understanding facts, but is not intended to establish evidence. . . . In essence, an examiner's report paints a picture, his or her image of what happened in the case, and ends *with that expert's opinion* of what that story means, in legal terms.
> The report puts the story on paper and provides a context for debate. *It is the duty of the parties to formulate a fuller version of the debate using the rules of evidence.*
> *Id.* at 325 (citations omitted; emphasis added).

**20.** Judge Gonzalez issued separate orders with respect to examiner discovery on February 19, 2004 and October 5, 2004. The Fee Committee relies on the October 5 order (Fee Committee Motion Exh. B), citing to its paragraph 2(e). But upon review of that order, and paragraph 2(e) in particular (which addresses only the production of privilege logs), I do not find it particularly helpful to the Fee Committee's position. (In fact, if the Enron

that he would consider (as will this Court, see Part III below), whether desired documents could be obtained from another source. The district court, affirming him, did likewise.[21] For reasons discussed in Part III below, I do not believe that I can, or should, decide the work product issues today, and thus do not now decide to what extent concerns that might be applicable to examiner work product carry over to fee committees, or whether anything other than routine work product analysis would be appropriate for determining Fee Committee work product issues. Issues of that character can be considered if and when any work product claims are addressed.

Only one other of the arguably relevant cases requires discussion. In one case discussed at length by both sides, *U.S. v. Folding Carton Administration Committee*,[22] the court stated more than once, in words or substance, that the acts of a committee appointed by a district judge to assist in the administration and distribution of a settlement fund,[23] and in particular, to "evaluate claims and make recom-

mendations concerning final disposition of the remaining funds,"[24] were "judicial functions."[25] But the *Folding Carton* court did so in the context of an effort to hold the committee members financially responsible for alleged wrongful conduct in making their recommendations—something for which I expressly gave Fee Committee members immunity—and not in the context of an effort merely to elicit facts in discovery.

To be sure, if the *Folding Carton* view that recommendations to a court were "judicial functions" were then linked with the analysis in *Lickman* discussed above (with which, as noted, I concur), *Folding Carton* would at first blush support the Fee Committee's argument that judicial immunity supports discovery immunity as well. But both sides agree that the language in *Folding Carton* on which the Fee Committee relies is *dictum*. And like so much *dictum*, it must be relied on with care when applied to wholly different contexts, which the *dictum*-speaking court might not have focused on or had occasion to consider—

---

examiner were wholly exempt from discovery obligations, it is difficult to see why his delivery of privilege logs would ever be an issue).

By contrast, I find the February 19 order quite relevant. It provided for an initial preclusion from serving upon the examiner or his professionals any formal or informal discovery requests, but continued with a significant proviso:

> that *in the event a party in interest affirms that it has been unable to obtain discovery of certain information from any other source*, then such party in interest *may request that the Court permit discovery of that information from the Enron Corp. Examiner and the Enron Corp. Examiner's Professionals* in a manner that is consistent with this Court's orders concerning the confidentiality of Rule 2004 materials. The Enron Corp. Examiner and the Enron Corp. Examiner's Professionals have the right to and may oppose any such request for discovery....

February 19, 2004 Order (*In re Enron Corp.*, Case No. 01–16034 AJG, ECF Docket # 16382) at ¶ 2(i) (emphasis added).

21. On appeal, Judge Buchwald of the district court affirmed the February 19 order, again without a holding that the examiner was entitled to total immunity from discovery. In that connection, she said "Indeed, the issue of what protection, *if any*, is accorded the files of the Bankruptcy Examiner is no different in kind from other privilege issues...." *Brown v. Batson* (*In re Enron Corp.*), 2004 WL 1661093 (S.D.N.Y. July 22, 2004) (Buchwald, J.) (emphasis added).

22. 121 F.R.D. 69 (N.D.Ill.1988) (Norgle, J.).

23. *Id.* at 71.

24. *Id.* at 72.

25. *Id.*

such as discovery immunity, as contrasted to substantive immunity.

In *dictum* of my own, I will say that I would be inclined to agree that with or without express language like that in the Protocol here, members of any court-authorized committee charged with making recommendations to a court—such as the settlement fund committee in *Folding Carton* and the Fee Committee here—could not appropriately be held civilly liable for any recommendations they might make to the court, and thus I would reach the same result that the *Folding Carton* court did on substantive immunity. But I believe that the "judicial function" the *Folding Carton* court was speaking to—a court-requested recommendation to the court—does not equate to a judicial determination, and thus is not the same as the judicial functions addressed in *Lickman*—adjudicatory decisions by a judicial officer, on the merits. *Folding Carton* supports the view that even if I had not expressly provided that the Fee Committee and its members would receive protection from liability to those displeased with its actions, they would be entitled to such protection anyway. But I cannot read *Folding Carton* as holding, or suggesting, that the Fee Committee receive discovery immunity as well.

■ Thus I conclude, and rule, that the Protocol I approved does not grant immunity from discovery, and neither the designation of the Fee Committee as an "officer of the court," nor the Fee Committee's inherent nature, makes it wholly immune from otherwise proper discovery requests.

## II.

■ The Fee Committee also argues that it is "not a party" to the contested matter relating to BSF's final fee application,[26] and implies, though it does not expressly state, that this provides a second basis for protective order relief. Assuming that such a contention has in fact been made, I cannot agree with it. At least in the federal courts, discovery is available from parties and nonparties alike.

## III.

■ While I have ruled that the Fee Committee does not have absolute immunity from discovery requests, I am nevertheless granting protective order relief from the Discovery Requests at this time, without prejudice to a renewed request by BSF for discovery by the Fee Committee or its agents.

■ In my view, even though fee committees are not immune from discovery, care must be taken to protect their legiti-

**26.** While it is true that the Fee Committee has not yet objected to BSF's final fee application, or unequivocally taken a position with respect to it, both sides agree that the matters relating to BSF's fee application have given rise to a contested matter. My Case Management Order # 3 expressly provides that contested matters include potential disputes that would without doubt be contested matters after an objection is filed, and that discovery is authorized without further leave of Court under those circumstances. It does so to address a major need in this Court, especially in large cases. The need for timely relief with respect to often complex matters does not permit the luxury of commencing discovery only after the objection has been filed. And it is a common practice, at least in this district, for movants to extend the deadline for objections, sometimes up to the eve of hearing of a motion, to facilitate further discussion or settlement, or to permit potential objectors to acquire additional information, informally or through discovery.

In fact, I relied on the availability of discovery before objection, *inter alia*, when I declined to appoint an examiner, and then rejected a contention by BSF that the Fee Committee should be required first to file an objection before taking discovery of BSF.

mate rights to the protection of work product, attorney mental impressions, and the attorney-client privilege. And while I have seen no evidence of an improper purpose here (and indeed I fully understand the desire of BSF to gather evidence, from one source or another, of contemporaneous consideration by or on behalf of the Fee Committee of the reasonableness of the vendor charges—particularly any facts that may have been gathered by the Fee Committee with respect to the "going rate" for services, or amounts that were charged for similar services in other cases), I think courts should be wary of efforts to use discovery from fee committees as a tactical measure, or to go "tit for tat." I also think that in many cases, much of the work of any fee committee may have most, if not all, of the trappings of work product. Consistent with any work product analysis, I think that courts should direct discovery of fee committees only as a last resort, to ensure that such discovery is really necessary—both temporally (to await the filing of an objection that makes the desired discovery necessary or appropriate) and substantively (to see if the relevant information can be obtained from other sources).

The Fee Committee noted its reservation of rights with respect to work product and other discovery exceptions, but understandably did not contend that such matters appropriately could or should be decided on this motion. They are not yet ripe—at least for the reasons that I cannot yet determine whether otherwise legitimate BSF needs can be satisfied from other sources, and because I do not yet

have sufficient factual development, by affidavit or otherwise, to consider the particular items of requested discovery, and the facts relevant to work product or similar claims with respect to the particular requests. While I am saying "not now" with respect to the Discovery Requests that BSF has propounded to the Fee Committee and against which the Fee Committee has moved, I am not saying "never." BSF can hereafter propound requests, if it has a need to, and in the event that it does so, today's determination is without prejudice to any relief to which the Fee Committee might be entitled on more particularized grounds—including, most obviously, claims of work product, attorney mental impressions, or attorney-client privilege.[27]

### Conclusion

The Fee Committee's motion for a protective order precluding BSF from further pursuit of the Discovery Requests, insofar as the Fee Committee seeks protection from the Discovery Requests *now,* is granted. The Fee Committee's motion for a protective order, insofar as it seeks to preclude BSF from *ever* pursuing the Discovery Requests, is denied. The Fee Committee's motion for a protective order precluding BSF from pursuit of *further* discovery requests of the Fee Committee and its agents is denied, without prejudice to any rights to relief on more particularized grounds, such as work product, attorney mental impressions, or attorney-client privilege.

The time to appeal, or to move for leave to appeal, this determination will run from the date of entry of this order, and not

---

27. Without foreclosing the parties from bringing forward any other relevant evidence or argument, it would be helpful to me, in the event of any future dispute as to these matters, if the parties were to cover the specifics of the request; the extent, if any, to which the evidence could be obtained elsewhere; to

what point in time, along the time-line of relevant events, the requested discovery relates (*e.g.,* at the time of, or after, arguably relevant negotiations, and before, or after, disputes arose); and facts relevant to the role and conduct of the person or entity from which discovery is desired.

from the earlier announcement of my bottom line conclusions at the conclusion of the hearing on this matter.

SO ORDERED.