297 F.3d 940
 In re Cherry Barbara CASTILLO, Debtor,
Nancy Curry, Chapter 13 Trustee, Appellant,
v.
Cherry Barbara Castillo; G. Thomas Leonard, Appellees.
In re Cherry Barbara Castillo, Debtor,
Nancy Curry, Chapter 13 Trustee, Appellant,
v.
Cherry Barbara Castillo; G. Thomas Leonard, Appellees.
 No. 00-55846.
 No. 00-55851.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2001.
 Filed July 26, 2002.
 As Amended September 6, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Elmer Dean Martin III, Diamond Bar, CA, for the appellant.
 Bruce A. Lindsay, Moss, Hovden & Lindsay, Whittier, CA, for the debtor-appellee.
 G. Thomas Leonard, Attorney Propria Persona, Fullerton, CA, appellee.
 E. Roy Hawkens, United States Department of Justice, Civil Division, Washington, DC, for the amicus.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel, Carlson, Perris and Meyers, Bankruptcy Judges, Presiding. BAP Nos. CC-99-01353-PCMe, CC-99-01439-PCMe.
 Before: BRUNETTI, RYMER and WARDLAW, Circuit Judges.
 WARDLAW, Circuit Judge.
 
 
 1
 We must decide whether a standing Chapter 13 Bankruptcy Trustee enjoys absolute quasi-judicial immunity for scheduling and noticing a bankruptcy confirmation hearing. We agree with the Bankruptcy Appellate Panel ("BAP") that the Trustee and her assistant enjoy absolute quasi-judicial immunity from liability for the decision to schedule the bankruptcy confirmation hearing. Because we further conclude that the giving of notice is a part of the discretionary scheduling function, however, we reject the BAP's holding that immunity does not extend to the failure to give notice of the hearing.
 
 I. Factual and Procedural Background
 
 2
 Cherry Barbara Castillo filed this Chapter 13 bankruptcy case on September 18, 1997. Nancy Curry was appointed as Trustee in Castillo's case. A staff attorney employed by her, Julie Feder, assisted Curry with certain matters in the case. After Castillo's petition was filed, Curry conducted an 11 U.S.C. § 341(a) meeting of creditors on October 29, 1997. At the meeting, Curry decided on the basis of various irregularities in the petition that the § 341(a) meeting should be continued to January 20, 1998. She believed that she could not determine the feasibility of Castillo's proposed plan until the court adjudicated objections to the plan on December 4, 1997. As Curry conceded in her briefs to the Bankruptcy Court, due to a clerical error in her office, the confirmation hearing was actually set for December 3, 1997. Neither Castillo nor her counsel was notified of the rescheduled confirmation hearing date. Nevertheless, on December 3, 1997, a confirmation hearing was held. Castillo did not appear, and therefore did not provide proof that she had made the plan payments as required for confirmation. The Trustee informed the court that a plan payment had not been made because one had not been recorded on the Trustee's books, even though Castillo had in fact mailed a late payment to the Trustee sometime after November 22, 1997. As a result, the debtor's Chapter 13 case was dismissed on December 16, 1997.
 
 
 3
 Castillo's counsel, G. Thomas Leonard, received notice of the dismissal sometime after it was served on December 19, 1997, but did not take any action during the seven days before the mortgagee took advantage of the dismissal to foreclose on Castillo's residence on December 26, 1997. Leonard then successfully moved to vacate the dismissal, as Curry did not oppose the debtor's motion to vacate. Because Castillo's residence had been sold to a third party, however, the bankruptcy court refused to set aside the foreclosure sale. On January 25, 1999, Castillo sought leave of the bankruptcy court to prosecute suit against the Trustee and her staff attorney in Los Angeles County Superior Court. Castillo also named her attorney, Leonard, as a defendant, based on the fact that despite receiving timely notice of the dismissal, Leonard's office failed to file a motion to vacate the dismissal before the foreclosure sale date of December 26, 1997.
 
 
 4
 Before the bankruptcy court, Castillo contended that (1) the Trustee was negligent in scheduling the December 3, 1997 confirmation hearing without due notice to Castillo or her counsel; (2) the Trustee was not immune from suit; and (3) the requirement that Castillo bring her state law claim against her bankruptcy attorney for any malpractice on his part in state court created a danger of conflicting rulings. The bankruptcy court granted Castillo's motion after hearing on February 16, 1999, by order entered March 23, 1999. The court reasoned that the Trustee had a duty to "provide due process to the debtor" and that "in this case debtor and debtor's counsel were not given the proper ... due process," which resulted in "serious" consequences. The court also noted that the debtor had complied with her Chapter 13 requirements.
 
 
 5
 The Trustee sought reconsideration of the bankruptcy court's orders. In addition, attorney Leonard moved the bankruptcy court for leave to cross-complain against Curry and Feder in state court. The bankruptcy court denied Curry's motion for reconsideration after hearing on May 6, 1999, by order entered May 20, 1999. It also granted Leonard's motion for leave to sue Curry and Feder on July 23, 1999.
 
 
 6
 The BAP granted leave to appeal what it viewed as the interlocutory bankruptcy court decision, citing In re Kashani, 190 B.R. 875 (B.A.P. 9th Cir.1995). It then extended quasi-judicial immunity for damages relating to the miscalendaring of the confirmation hearing, but not for damages resulting from the failure to give notice of the hearing. Further ruling that the failure to give notice violated a duty imposed by law upon the Trustee, the BAP held that the suit could proceed under our decision in In re Cochise College Park, 703 F.2d 1339 (9th Cir.1983).
 
 II. Jurisdiction
 
 7
 Curry challenges the bankruptcy court's jurisdiction to grant Castillo and Leonard leave to sue and, in turn, appellate jurisdiction of the BAP and our court to review those orders.
 
 A. Jurisdiction of the Bankruptcy Court
 
 8
 Curry asserts that the bankruptcy court lacked jurisdiction to hear Castillo's and Leonard's motion for leave to file suit against the Trustee because the case had previously been dismissed and a bankruptcy court may not sua sponte reopen a dismissed bankruptcy case. Curry has couched her argument as a challenge to the bankruptcy court's power to "reopen" a previously dismissed case. However, as the bankruptcy judge noted, although the Chapter 13 case had been dismissed, it had not been closed. Thus there was no need to reopen the case to hear the motion. In any event, a bankruptcy court has broad discretion to reopen a case sua sponte: The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
 
 
 9
 11 U.S.C. § 105(a); see also 11 U.S.C. § 350(b) ("A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.").
 
 
 10
 A bankruptcy "court's decision to reopen is entirely within its sound discretion, based upon the circumstances of each case." In re Elias, 215 B.R. 600, 604 (B.A.P. 9th Cir.1997), citing In re Rosinski, 759 F.2d 539, 540-41 (6th Cir.1985); Citizens Bank & Trust Co. v. Case, 937 F.2d 1014, 1018(5th Cir.1991); In re Rediker, 25 B.R. 71, 73 (Bankr.M.D.Tenn. 1982). As the Seventh Circuit has stated:
 
 
 11
 [N]umerous courts have ruled that jurisdiction is not automatically terminated with the dismissal of the underlying bankruptcy case, and that bankruptcy courts have discretion to retain jurisdiction over adversary proceedings. The rationale for retention of jurisdiction over an adversary proceeding is that some cases "have progressed so far that judicial interference is needed to unravel or reserve the rights of parties."
 
 
 12
 In re Statistical Tabulating Corp., Inc., 60 F.3d 1286, 1289 (7th Cir.1995) (quoting In re Morris, 950 F.2d 1531, 1534-35 (11th Cir.1992)).
 
 
 13
 Even if the bankruptcy court had reopened a dismissed case, its decision could only be set aside for an abuse of discretion. In re Slyman, 234 F.3d 1081, 1086 (9th Cir.2000). The trial court's exercise of its discretion will not be disturbed unless there is "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." In re Eisen, 31 F.3d 1447, 1451 (9th Cir.1994) (internal quotations omitted).
 
 
 14
 Regardless of whether the dismissal constituted some sort of constructive closure, we do not believe that the bankruptcy court abused its discretion by sua sponte setting aside the dismissal for the limited purpose of allowing the hearing on the motion to proceed, and allowing the entry of an order granting the motion. It was appropriate for the bankruptcy court to reopen the case to determine whether to grant leave because:
 
 
 15
 it is generally held that without leave of the bankruptcy court, no suit may be maintained against a trustee for actions taken in the administration of the estate. A court other than the appointing court has no jurisdiction to entertain an action against the trustee for acts within the trustee's authority as an officer of the court without leave of the appointing court.
 
 
 16
 3 COLLIER ON BANKRUPTCY¶ 323.03[3] (15th ed. rev.2001). The requirement of obtaining leave from the appointing court to sue a trustee is long-standing. See Barton v. Barbour, 104 U.S. 126, 129, 26 L.Ed. 672 (1881) (Court-controlled receiverships may be sued by naming receivers in their official capacities if permission is granted by the appointing court.); see also In re Linton, 136 F.3d 544, 546 (7th Cir.1998) (bankruptcy trustee cannot be sued without leave of the court that appointed trustee); In re Lehal Realty Assocs., 101 F.3d 272, 276 (2d Cir.1996) (same); In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir.1993) (same); Leonard v. Vrooman, 383 F.2d 556, 560 (9th Cir.1967) (noting that a trustee in bankruptcy is an officer of the court and is not subject to suit without leave of the appointing court for acts done in his official capacity and within his authority); Vass v. Conron Bros. Co., 59 F.2d 969, 970 (2d Cir.1932) (holding that a bankruptcy trustee, like a receiver, is an officer of the court, and trustee's possession is protected because it is the court's); In re Kashani, 190 B.R. 875, 885 (B.A.P. 9th Cir.1995) (noting that the granting of leave for a party to sue the trustee is within the sound discretion of the appointing court).
 
 B. Appellate Jurisdiction
 
 17
 Contrary to the BAP's conclusion, the bankruptcy court's orders denying Curry's claim of quasi-judicial immunity were not interlocutory. Under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), courts have recognized that the denial of immunity is a "final" order. See, e.g., Behrens v. Pelletier, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (the denial of qualified immunity is an appealable "final" order under the Cohen doctrine, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528); Paine v. City of Lompoc, 265 F.3d 975, 980-81 (9th Cir.2001) (Denial of the absolute immunity accorded witnesses and participants in alleged conspiracies to testify falsely, like denials of other forms of absolute immunity, is a collateral order appealable in the absence of a final order under 28 U.S.C. § 1291.); Jones v. City of Jackson, 203 F.3d 875, 878 (5th Cir.2000) ("Typically, denials of qualified immunity, although not final orders, are immediately appealable under the collateral order doctrine set forth in [Cohen]."); Mendenhall v. Riser, 213 F.3d 226, 229-30 (5th Cir.2000) ("[A]lthough denials of qualified immunity on summary judgment are not final orders, they are immediately appealable under the collateral order doctrine if based on an issue of law."); Fry v. Melaragno, 939 F.2d 832, 835 (9th Cir.1991) (same).
 
 
 18
 Here, the bankruptcy court's orders granting Castillo's and Leonard's motions for leave to sue are orders denying immunity. They were final and appealable orders under the collateral order doctrine, so the BAP had jurisdiction under 28 U.S.C. §§ 158(a)(1) and (b)(1). Similarly, the BAP's partial affirmance was final, and we have jurisdiction under 28 U.S.C. § 158(d).
 
 III. Standard of Review
 
 19
 We review de novo a decision of the BAP. In re Dunbar, 245 F.3d 1058, 1061 (9th Cir.2001); In re Palmer, 207 F.3d 566, 567 (9th Cir.2000). We independently review the bankruptcy court's rulings on appeal from the BAP. Id; In re Mitchell, 209 F.3d 1111, 1115 (9th Cir. 2000). The bankruptcy court's conclusions of law regarding the immunity of a Chapter 13 trustee are reviewed de novo, while findings of fact are reviewed for clear error. In re Jercich, 238 F.3d 1202, 1205 (9th Cir.2001).
 
 IV. Immunity
 
 20
 Curry asserts immunity from suit under the theory that bankruptcy trustees are entitled to quasi-judicial immunity for actions that are integrally related to the adjudication of the bankruptcy case. Lonneker Farms, Inc. v. Klobucher, 804 F.2d 1096, 1097 (9th Cir.1986) ("[A] trustee in bankruptcy ... is entitled to derived judicial immunity because he is performing an integral part of the judicial process."). Castillo and Leonard argue that the Supreme Court's decision in Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993), redirects our inquiry away from whether actions performed by nonjudicial officers are integrally related to the judicial process to an examination of the nature of those functions. The Trustee is immune for actions that are functionally comparable to those of judges, i.e., those functions that involve discretionary judgment. Antoine, 508 U.S. at 436, 113 S.Ct. 2167. Appellees concede that a bankruptcy trustee would enjoy absolute quasi-judicial immunity for judicial functions involving the exercise of discretionary judgment, such as the decision to schedule a bankruptcy confirmation hearing, but contend there can be no immunity for purely ministerial acts, such as the failure to give notice of a hearing. Trustee Curry, as the proponent of the claim of absolute immunity, bears the burden of establishing that such immunity is justified. Id. at 432, 113 S.Ct. 2167.
 
 A. Judicial Immunity
 
 21
 Anglo-American common law has long recognized judicial immunity, a "sweeping form of immunity" for acts performed by judges that relate to the "judicial process." Forrester v. White, 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); Imbler v. Pachtman, 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). This absolute immunity insulates judges from charges of erroneous acts or irregular action, even when it is alleged that such action was driven by malicious or corrupt motives, Forrester, 484 U.S. at 227-28, 108 S.Ct. 538, or when the exercise of judicial authority is "flawed by the commission of grave procedural errors." Stump v. Sparkman, 435 U.S. 349, 359, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Judicial immunity discourages collateral attacks on final judgments through civil suits, and thus promotes the use of "appellate procedures as the standard system for correcting judicial error." Forrester, 484 U.S. at 225, 108 S.Ct. 538. "Most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review." Id. at 227, 108 S.Ct. 538.
 
 
 22
 B. Quasi-Judicial Immunity for Non-judicial Officers
 
 
 23
 Absolute judicial immunity is not reserved solely for judges, but extends to nonjudicial officers for "all claims relating to the exercise of judicial functions." Burns v. Reed, 500 U.S. 478, 499, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (Scalia, J., concurring in part and dissenting in part). The Supreme Court has been "quite sparing in [its] recognition of absolute immunity, and [has] refused to extend it any further than its justification would warrant." Burns, 500 U.S. at 486-87, 111 S.Ct. 1934(internal quotation marks and citations omitted). Yet the Court has also guarded the "traditional common-law protections extended to the judicial process." Forrester, 484 U.S. at 225, 108 S.Ct. 538. Specifically, judicial immunity has been readily extended to such nonjudicial officers as:
 
 
 24
 military and naval officers in exercising their authority to order courts-martial.... to grand and petit jurors in the discharge of their duties as such; to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of taxes; to commissioners appointed to appraise damages when property is taken under the right of eminent domain; to officers empowered to lay out, alter, and discontinue highways; to highway officers in deciding that a person claiming exemption from a road tax is not in fact exempt, or that one arrested is in default for not having worked out the assessment; to members of a township board in deciding upon the allowance of claims; to arbitrators, and to the collector of customs in exercising his authority to sell perishable property, and in fixing upon the time for notice of sale.
 
 
 25
 Burns, 500 U.S. at 499-500, 111 S.Ct. 1934(quoting T. COOLEY, LAW OF TORTS 410-11 (1880)).
 
 
 26
 Judicial or quasi-judicial immunity is not available only to those who adjudicate disputes in an adversarial setting. Rather, the immunity is extended in appropriate circumstances to non jurists "who perform functions closely associated with the judicial process." Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). The Supreme Court has recognized that individuals, when performing functions that are judicial in nature, or who have a sufficiently close nexus to the adjudicative process, are entitled to a grant of absolute quasi-judicial immunity. Among those the Court has found immune are: (1) prosecutors, when initiating a prosecution and presenting the state's case, Imbler, 424 U.S. at 431, 96 S.Ct. 984; (2) prosecutors, when taking acts and making decisions in preparation for the initiation of a prosecution or trial, Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Burns, 500 U.S. at 492, 111 S.Ct. 1934; (3) administrative law judges and agency hearing officers, when performing adjudicative functions within a federal agency, Cleavinger, 474 U.S. at 200, 106 S.Ct. 496; Butz v. Economou, 438 U.S. at 513-514, 98 S.Ct. 2894; (4) agency officials, when performing functions analogous to those of a prosecutor, Butz, 438 U.S. at 515, 98 S.Ct. 2894; (5) agency attorneys, in arranging for the presentation of evidence in the course of an administrative adjudication, id. at 517, 98 S.Ct. 2894; and (6) individuals, when acting within the scope of their duties, who participate in the judicial process, such as grand jurors, petit jurors, advocates, and witnesses. Id. at 509, 512, 98 S.Ct. 2894; Burns, 500 U.S. at 489-90, 111 S.Ct. 1934.
 
 
 27
 In Antoine, the Supreme Court worked a sea change in the way in which we are to examine absolute quasi-judicial immunity for nonjudicial officers. Antoine, 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391. The Court announced that absolute quasi-judicial immunity will be extended to nonjudicial officers only if they perform official duties that are functionally comparable to those of judges, i.e., duties that involve the exercise of discretion in resolving disputes. Antoine, 508 U.S. at 435, 113 S.Ct. 2167. Under this approach, to determine whether a nonjudicial officer is entitled to absolute quasi-judicial immunity, courts must look to the nature of the function performed and not to the identity of the actor performing it. Buckley, 509 U.S. at 269, 113 S.Ct. 2606(quoting Forrester, 484 U.S. at 229, 108 S.Ct. 538); Stump, 435 U.S. at 362, 98 S.Ct. 1099; Romano v. Bible, 169 F.3d 1182, 1186 (9th Cir.1999).
 
 
 28
 Antoine involved a section 1983 action against a seriously delinquent court reporter, who despite payment therefor and several court orders, failed to deliver a complete transcript of a criminal trial on appeal. Reasoning that the making of the official record of a court proceeding by a court reporter is "part of the judicial function," we concluded that the reporter was entitled to absolute quasi-judicial immunity for actions within the scope of her authority. Antoine v. Byers & Anderson, Inc., 950 F.2d 1471, 1476 (9th Cir.1991), rev'd 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993).
 
 
 29
 The Supreme Court disagreed that the issue could be decided by asking whether court reporters were part of the judicial function. It noted that the determination of which officials perform functions that might justify absolute immunity turns first on a "considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Antoine, 508 U.S. at 432, 113 S.Ct. 2167(citations omitted). Finding that "[c]ourt reporters were not among the class of persons protected by judicial immunity in the 19th century," the court next rejected the notion that court reporters served as the functional equivalents of "common-law judges who made handwritten notes during trials." Antoine, 508 U.S. at 433-34, 113 S.Ct. 2167. But even if common-law judges had performed tasks equivalent to those of court reporters, that would not end the immunity inquiry, for the key question after Antoine is whether judges themselves, when performing the function at issue, would be entitled to absolute immunity. Antoine, 508 U.S. at 435, 113 S.Ct. 2167.
 
 
 30
 The Court noted the "doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." Id. Thus it is only when the judgment of an official other than a judge involves the exercise of discretionary judgment that judicial immunity may be extended to that nonjudicial officer. The Court concluded that "court reporters do not exercise the kind of judgment that is protected by the doctrine." Id. at 437, 113 S.Ct. 2167.
 
 
 31
 Consistent with Antoine's teachings, we must first inquire as to the immunity historically accorded a bankruptcy trustee at common law, during the development of the common-law doctrine of judicial immunity. We next consider whether the particular functions of the bankruptcy trustee at issue in this case — the decision to schedule a bankruptcy confirmation hearing, and the failure to give notice of that hearing — are functions involving the exercise of discretionary judgment. Id. at 436, 113 S.Ct. 2167.
 
 C. The Bankruptcy Trustee
 
 32
 The Chapter 13 bankruptcy trustee is a creature of the Bankruptcy Code, which enumerates specific duties, rights, and powers of the bankruptcy trustee. See, e.g., 11 U.S.C. §§ 323, 704, 1106, and 1302(describing the role, capacity, and duties of trustees). The bankruptcy trustee's role, functions, and duties are ultimately shaped, however, by the history and peculiar needs and purposes of bankruptcy proceedings.
 
 
 33
 i. Bankruptcy Officers at Common Law
 
 
 34
 The first United States bankruptcy law, passed in 1800 pursuant to the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4, had as its conceptual origin the English bankruptcy system familiar to the Framers of the United States Constitution. Act of Apr. 4, 1800, ch. 19, 2 Stat. 19 (repealed 1803). Much of the language of the 1800 Act was taken verbatim from the contemporary English bankruptcy law. See, Charles J. Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr.Inst. L.Rev. 5, 7 & n.11 (1995). English bankruptcy law was initially a function of the chancery, which the Lord Chancellor delegated in turn to bankruptcy "commissioners" to supervise the process. Id. at 8. The bankruptcy commissioners had a role similar to both the modern bankruptcy trustee and bankruptcy judge, performing trustee — like activities such as collecting, liquidating, and distributing the debtor's property to creditors, and more traditional judicial activities, such as seizing property, summoning persons to appear before them, and committing people to prison. Id. at 8-9. In time, the trustee-like functions would be delegated to "assignees" — so called because the bankruptcy estate was assigned to them. Id.
 
 
 35
 In the United States, the bankruptcy system in the nineteenth century was based on the contemporary English system of chancellor, commissioner, and assignee. The district courts were given original jurisdiction as "courts of bankruptcy." They were directed, however, to appoint one or more "registers in bankruptcy" to assist the district court judge. These registers were the predecessors of the twentieth century referee and bankruptcy judge. Assignees, on the other hand, continued to carry out trustee-like functions in supervising the liquidation. Id. at 19. Thus the common-law and nineteenth century antecedents of the modern bankruptcy trustee were entrusted with both administrative and adjudicatory functions. To the extent the trustee performed the functions of a modern-day bankruptcy judge, immunity would have extended to the performance of these common-law adjudicatory functions. See Antoine, 508 U.S. at 433-34 & n. 8, 113 S.Ct. 2167.
 
 
 36
 ii. The Current Bankruptcy Trustee System
 
 
 37
 Although the bankruptcy system evolved over the next two centuries, the duties of bankruptcy trustees (and their antecedents) remained relatively constant throughout this period. Today, under the United States Trustee Program, the Attorney General appoints regional U.S. Trustees. These U.S. Trustees are charged with the responsibility of supervising the administration of bankruptcy cases. In regions with sufficient volume of Chapter 13 bankruptcy cases, the U.S. Trustee for that region "may, subject to the approval of the Attorney General, appoint one or more individuals to serve as standing trustee," 28 U.S.C. § 586(b), a position that is also referred to as a "private trustee." H.R.Rep. No. 95-595, at 101, 106-06 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6062, 6066-68. Standing trustees must satisfy the eligibility requirements of 11 U.S.C. § 321, and qualify under 11 U.S.C. § 322 and 28 U.S.C. § 586. Once appointed, the standing trustee-operating under the supervision of the U.S. Trustee and pursuant to legislative and judicial directives — performs a wide variety of functions previously performed by bankruptcy judges. The United States Trustee is the "watchdog" of the bankruptcy system, H.R.Rep. No. 95-595, at 4 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 5966, charged with preventing fraud and abuse and with "fill[ing] the vacuum" caused by possible creditor inactivity. H.R.Rep. No. 95-595, at 100 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6061. The establishment, maintenance, and supervision of the panel of bankruptcy trustees is the United States Trustee's "primary function, and his most important contribution to the administration of the bankruptcy system." H.R.Rep. No. 95-595, at 439 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6394-95.
 
 
 38
 iii. Duties of the Bankruptcy Trustee under the Bankruptcy Code
 
 
 39
 The statutory duties of a bankruptcy trustee operating under the aegis of the U.S. Trustee are enumerated in 11 U.S.C. §§ 704, 1302, 1304. Generally, the trustee is to gather and liquidate the property of the estate, to be accountable for the estate, ensure that the debtor performs his or her obligations, investigate the finances of the debtor, review the proofs of claim, and where appropriate, oppose the debtor's discharge, be available to provide relevant information to parties-in-interest, and by court order, operate the business on a short-term basis. The trustee also must prepare the final report and an accounting for the administration of the estate. 11 U.S.C. §§ 704, 1302. Just as in the nineteenth century (and earlier) the bankruptcy trustee performs both adjudicatory and administrative functions.
 
 
 40
 Thus in combining administrative duties with adjudicatory functions, Congress created a hybrid official. The bankruptcy trustee, both at common law and today, performs some functions historically viewed as judicial in nature, and others that are not. Although, like the common-law bankruptcy judicial officers, the trustee is charged with many legal, adjudicative, clerical, financial, administrative, and business functions, quasi-judicial immunity attaches to only those functions essential to the authoritative adjudication of private rights to the bankruptcy estate. Antoine, 508 U.S. at 433, 113 S.Ct. 2167. Therefore we must examine the particular function here at issue.
 
 
 41
 D. Quasi-Judicial Immunity for Scheduling and Noticing the Bankruptcy Hearing
 
 
 42
 We agree with the BAP that the scheduling of hearings by the bankruptcy trustee is a discretionary function protected by absolute immunity. This conclusion is uniform among the circuit courts that have addressed the question. Castillo, 248 B.R. at 158.
 
 
 43
 In Rodriguez v. Weprin, the Second Circuit held that court personnel are immune from administrative tasks if these tasks are "judicial in nature and an integral part of the judicial process." 116 F.3d 62, 66 (2d Cir.1997) (citing Antoine, 508 U.S. at 433-34 n. 8, 113 S.Ct. 2167). There, the Second Circuit concluded that court clerks enjoy quasi-judicial immunity from claims arising from alleged mismanagement of the court's calendar that delayed resolution of the appellant's appeal, because "[a] court's inherent power to control its docket is part of its function of resolving disputes between parties. This is a function for which judges and their supporting staff are afforded absolute immunity." Rodriguez, 116 F.3d at 66 (citing Antoine, 508 U.S. at 433-34 n. 8, 113 S.Ct. 2167).
 
 
 44
 The D.C. Circuit has ruled similarly. Wagshal v. Foster, 28 F.3d 1249 (D.C.Cir. 1994). In Wagshal, the court held that a case evaluator in the Superior Court system performs judicial functions, including scheduling motions, and that those functions involve "substantial discretion" resulting in absolute immunity. Id. at 1252. Much like some of the functions of a bankruptcy trustee, the case evaluator's assigned tasks included "identifying factual and legal issues, scheduling discovery and motions with the parties, and coordinating settlement efforts." Id. The D.C. Circuit noted that these tasks:
 
 
 45
 obviously involve substantial discretion, a key feature of the tasks sheltered by judicial immunity and the one whose absence was fatal to the court reporter's assertion of immunity in Antoine .... [t]he tasks appear precisely the same as those judges perform going about the business of adjudication and case management.
 
 
 46
 Id. (citing Antoine, 508 U.S. at 432-34, 113 S.Ct. 2167).
 
 
 47
 The BAP went astray by segregating what is essentially one function — controlling the docket — into two discrete tasks. Both the scheduling and giving of notice of hearings are part of the judicial function of managing the bankruptcy court's docket in the resolution of disputes. This function is unquestionably discretionary in nature. The Seventh Circuit has also reached this conclusion, holding that a prisoner review board is absolutely immune from liability for failing to give notice of a board review hearing. It reasoned that activities, such as giving notice, that are: inexorably connected with ... and are analogous to judicial action invoke absolute immunity.... Thus, not only the actual decision ... but also activities that are part and parcel of the decision process justify absolute immunity.
 
 
 48
 Wilson v. Kelkhoff, 86 F.3d 1438, 1444 (7th Cir.1996) (internal quotation marks and citations omitted). Rejecting the argument that the board was not immune because the giving of notice "involved simple compliance with the law," the Seventh Circuit further reasoned:
 
 
 49
 Antoine and Forrester [v. White, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)] do not support the proposition that judicial acts that are part of the judicial function are excluded from absolute immunity because they could be characterized as nondiscretionary or even ministerial....
 
 
 50
 ... [T]he fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function.
 
 
 51
 Id. at 1444-45 (internal quotation marks and citation omitted).
 
 
 52
 Moreover, we have extended absolute quasi-judicial immunity in post-Antoine decisions to court clerks and other nonjudicial officers for purely administrative acts — acts which taken out of context would appear ministerial, but when viewed in context are actually a part of the judicial function. Moore v. Brewster, 96 F.3d 1240 (9th Cir.1996). In Moore, the plaintiff sued the judge, the judge's clerk, and the clerk of the court, among others, for due process violations relating to an improper handling of a supersedeas bond. We found the judge entitled to absolute immunity because his actions lay within the scope of his judicial functions. The judge's clerk was also immune from suit because his functions were "quasijudicial" in nature:
 
 
 53
 The concern for the integrity of the judicial process that underlies the absolute immunity of judges is reflected in the extension of absolute immunity to certain others who perform functions closely associated with the judicial process.
 
 
 54
 Moore, 96 F.3d at 1244 (citation and quotations omitted).
 
 
 55
 Our conclusion that we must consider the scheduling and notice of the hearing as one act is supported by our decision in the pre-Antoine case Ashelman v. Pope, 793 F.2d 1072 (9th Cir.1986). There we held that when determining whether a function is judicial in nature, a court must focus on the "ultimate act" rather than the constituent parts of the act. Logic compels such an extension in appropriate circumstances. Id. at 1078. For example, in this case the ultimate act was the scheduling and convening of an adjudicatory hearing, an act that neatly meets the definition of a judicial function. See, e.g., Rodriguez, 116 F.3d at 66-67 (court clerks entitled to quasi-judicial immunity for harms related to scheduling an appeal, even if that discrete task is viewed as administrative, because "court's inherent power to control its docket is part of its [judicial] function."). Giving notice of the hearing, after the hearing is scheduled, cannot meaningfully be separated from the act of scheduling and convening the hearing. A hearing to which no one is given notice would be likely held in an empty room. Simply put, a hearing without notice is not a hearing.
 
 
 56
 Most importantly, the giving of notice is part of the process due litigants. Fundamental fairness to the parties before the court requires notice of proceedings; notice is an essential part of the adjudicatory process. Therefore, we find immunity extends to the giving — or failure to give — notice, as well as to the scheduling of the hearing. The judicial function at issue meets both prongs of Antoine. At common law the bankruptcy trustee would have enjoyed immunity for the judicial function of controlling and managing her docket in the bankruptcy proceedings, and both the scheduling and noticing of the proceeding are a part of that discretionary function. See Rodriguez, 116 F.3d at 66-67; Ashelman, 793 F.2d at 1078.
 
 
 57
 We do not hold that all of the Trustee's many functions are covered by absolute quasi-judicial immunity. Cf. Lonneker Farms, 804 F.2d at 1097. We merely hold that the common law, legislative history, and the grant of immunity to bankruptcy trustees and similar judicial officers in analogous cases compel us to conclude that Curry is entitled to quasi-judicial immunity for both scheduling and noticing the confirmation hearing. Because we decide that Curry is entitled to immunity, we need not reach Castillo's argument that bankruptcy trustees may be liable for negligence. See Cochise College Park, 703 F.2d 1339.
 
 
 58
 AFFIRMED in part; REVERSED in part.