**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 15, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRIAN E. ROHRBOUGH; SUSAN A.
PETRONE, individually and as
personal representatives of the estate
of Daniel Rohrbough, deceased;
DAWN L. ANNA, individually and as
personal representative of the estate of
Lauren D. Townsend, deceased,

      Plaintiffs - Appellants,

v.

WAYNE N. HARRIS; KATHERINE
ANN HARRIS; THOMAS E.
KLEBOLD; SUSAN KLEBOLD,

      Defendants - Appellees.

———————————————

STATES OF ARKANSAS,
COLORADO, FLORIDA,
MARYLAND, MISSISSIPPI, NEW
HAMPSHIRE, NEW MEXICO,
NORTH DAKOTA, VIRGINIA,
WEST VIRGINIA, WYOMING, AND
SOUTH CAROLINA,

      Amici Curiae.

———————————————

MARK A. TAYLOR,

      Plaintiff - Appellant,

No. 07-1186 and 07-1202

v.

SLOVAY PHARMACEUTICALS,
INC.,

       Defendant.

_____

WAYNE N. HARRIS; KATHERINE
ANN HARRIS,

       Intervenors - Appellees.

_____

STATES OF ARKANSAS,
COLORADO, FLORIDA,
MARYLAND, MISSISSIPPI, NEW
HAMPSHIRE, NEW MEXICO,
NORTH DAKOTA, WEST
VIRGINIA, WYOMING, SOUTH
CAROLINA,

       Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:00-CV-808-LTB-PAC)**

---

Barry K. Arrington, Arrington & Associates, P.a., Arvada, Colorado, and
A. Bruce Jones (Anthony J. Navarro, with him on the briefs), of Holland & Hart,
LLP, Denver, Colorado, for Plaintiffs - Appellants, Bryan E. Rohrbough, et al.
and Mark A. Taylor.

C. Michael Montgomery (Erica O. Payne, with him on the briefs), of Montgomery, Kolodny, Amatuzio & Dusbabek, LLP, Denver, Colorado, for Defendants - Appellees Wayne N. Harris, et al. and Intervenors - Appellees Wayne N. Harris, et al.

Elizabeth H. McCann, Deputy Attorney General (John W. Suthers, Attorney General of Colorado, Daniel D. Domenico, Solicitor General of Colorado, William Allen and Megan Rundlet, Assistant Attorneys General, with her on the briefs), Denver, Colorado, for Amici Curiae.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

In these consolidated appeals we address the fate of several depositions taken in two civil cases in the United States District Court for the District of Colorado. Both cases arose out of the 1999 shootings at Columbine High School. We are asked to determine whether the district court erred in (1) finding that the depositions constitute records subject to the requirements of the Federal Records Act and (2) declining to lift the protective orders covering the depositions to allow an expert in youth violence to review them. We affirm the district court on both issues.

## I.     BACKGROUND

These appeals follow the settlement of two civil cases brought in the wake of the Columbine school shootings. In the first case, *Rohrbough v. Harris*,

parents of two of the murdered students (the *Rohrbough* plaintiffs)[1] sued the parents of the two shooters, Eric Harris and Dylan Klebold.  In the second case, *Taylor v. Solvay Pharmaceuticals*, Mark Allen Taylor—a student who was seriously injured in the shootings—sued the drug company that had manufactured a drug allegedly taken by Harris before the shootings.  Most of the discovery materials for both *Rohrbough* and *Taylor* were kept in a locked room at the federal courthouse (called the Evidence Room) under the supervision of a special master.

A series of protective orders in each case restricted access to and disclosure of discovery materials.  Under the orders, evidence was to be produced by depositing it with the special master.  If a deposition required the use of any of the protected documents, it was to be taken in the Evidence Room with the special master present.  All the depositions at issue in this case were taken in this manner.

Both cases settled at an early stage.  Before they settled, the depositions of Mr. and Mrs. Harris were taken in *Taylor*, and depositions of the Harrises and Mr. and Mrs. Klebold were taken in *Rohrbough*.  Because *Rohrbough* settled shortly after the depositions of the Harrises and Klebolds were taken in that case, those depositions were never signed.  In neither case were the depositions ever used in conjunction with any motion or filed with the district court.  After the

---

[1]There were also other plaintiffs but they are not parties to this appeal.

settlements the magistrate judge entered an order covering both cases—the Evidence Room Order—to govern disposal of the discovery materials. The order stated that many of the materials in the Evidence Room, including the deposition transcripts and court-reporter notes, would be "disposed of" by the court. Taylor App. at 64, 68. Both the *Rohrbough* plaintiffs and Taylor objected to the order. The district court consolidated the two cases for consideration of the objections.

The objections opposed destruction of the Evidence Room materials because, among other reasons, they are of historical importance and other litigants might seek access to them. The Harrises, who were granted permission to intervene in *Taylor*, submitted a response in support of the Evidence Room Order, a position later joined by the Klebolds. The Colorado Attorney General filed a motion to intervene in the cases to object to destruction of the materials; the district court denied this motion but allowed the attorney general to proceed as an amicus curiae. The National Archives and Records Administration (NARA) also participated as an amicus, asserting that the Federal Records Act (FRA) likely prohibited the destruction of some of the materials covered by the Evidence Room Order.

At its hearing on the matter the district court proposed to transfer the materials in the Evidence Room to NARA, subject to a 25-year sealing order, and requested that the interested parties submit their views on the proposal. In their responses the parties and amici adopted the following positions: Neither the

Harrises nor the Klebolds believed the materials to be covered by the FRA; but the Harrises did not oppose the transfer to NARA so long as the confidentiality provisions of the protective order remained in effect, whereas the Klebolds preferred that the materials be destroyed. The *Rohrbough* plaintiffs opposed the transfer to NARA and sought a return to the "status quo" before the Evidence Room Order. The Colorado Attorney General requested that an expert in youth violence, Dr. Delbert S. Elliott, be permitted to review the depositions. The attorney general attached an affidavit from Dr. Elliott describing the study to be conducted and stating that the depositions could be helpful in assessing the impact of family life on the perpetrators' social, psychological, and moral development. Taylor supported the attorney general's request. Taylor did not oppose transferring the records to NARA, but he did object to placing a seal on them for 25 years.

After reading the depositions the district court determined that they were materials subject to the FRA and that they should be transferred to NARA for storage. The court also ordered that the depositions be kept under seal for 20 years. In reaching this conclusion, the court weighed the concerns counseling against disclosure of the depositions—including the risk that release of details about the shootings could trigger copycat incidents, the privacy interests of the parties and of nonparties mentioned in the depositions, and the reliance of the parties on the protective orders—against the public interest in using the materials

-6-

in the hope of preventing similar tragedies in the future. The court concluded that the balance of interests favored confidentiality and accordingly declined to allow Dr. Elliott access to the records. Taylor and the *Rohrbough* plaintiffs both appeal the order. Taylor challenges only the denial of Dr. Elloitt's access to the records, and the *Rohrbough* plaintiffs challenge only the determination that the depositions are subject to the FRA.

## II.    DISCUSSION

### A.    Federal Records Act

The *Rohrbough* plaintiffs consider the depositions that they took to be their property and wish to retain custody of them. Because the depositions were never signed, the special master's protocol for depositions did not allow counsel to make copies of the depositions, so the transcripts and the court-reporter notes and backup files held in the Evidence Room are the only ones in existence. The *Rohrbough* plaintiffs argue that the district court erred in ruling that the depositions are "records" under the FRA and that the district court therefore had no authority to transfer them to NARA. The Harrises and Klebolds take no position on whether the depositions are "records" under the FRA but do not oppose their transfer to NARA under seal. The district court's application of the FRA to the depositions is a mixed question of law and fact, but there are no disputed historical facts, so our review is de novo. *See Scanlon White, Inc. v. Comm'r*, 472 F.3d 1173, 1175 (10th Cir. 2006).

-7-

The FRA[2] governs the management, retention, and disposal of federal records. *See* 44 U.S.C. chs. 21, 25, 29, 31, 33. NARA has primary authority over the management of federal records under the FRA and is authorized to promulgate regulations regarding records management. *See*, *e.g.*, *id.* § 2904(a) ("The Archivist [of the United States, *see id.* § 2901(15), who administers NARA, *see id.* § 2102] shall provide guidance and assistance to Federal agencies with respect to . . . ensuring proper records disposition"); *id.* § 2904(c) (the Archivist, together with the Administrator of General Services, shall "have the responsibility—(1) to promulgate standards, procedures, and guidelines with respect to records management . . . ."); *id.* § 2905(a) ("The Archivist shall establish standards for the selective retention of records of continuing value . . . ."); *id.* § 3302 ("The Archivist shall promulgate regulations . . . establishing . . . (1) procedures for the compiling and submitting to him of lists and schedules of records proposed for disposal [and] (2) procedures for the disposal of records authorized for disposal . . . ."); *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 62 (D.C. Cir. 1983) ("Congress clearly intended to transfer final approval authority over the disposal of records to [NARA]"); *see also* 44 U.S.C. §§ 2908, 2909; 3303a(d) (additional authority to promulgate regulations). Materials

_____

[2]As the D.C. Circuit noted in *Armstrong v. Bush*, 924 F.2d 282, 284 n.1 (D.C. Cir. 1991), "The FRA is actually a series of statutes, which originated with the Federal Records Act of 1950, ch. 849, 64 Stat. 583, and the 1943 Disposal of Records Act, ch. 192, 57 Stat. 380." We will refer to the original acts and the amendments collectively as the FRA, as does NARA.

covered by the FRA must be maintained and (if appropriate) disposed of according to a schedule created by the originating agency and approved by NARA. *See id.* §§ 3303, 3314.

> The FRA provides the following definition of the term *records*:
>
> As used in [chapter 33], "records" includes all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. (This definition also applies in chapters 21, 25, 29 and 31. *See id.* § 2901(1)). The FRA defines "federal agency"—a term we take to be synonymous with the term "agency of the United States Government" in § 3301—as "any executive agency or any establishment in the legislative or judicial branch of the Government (except the Supreme Court, the Senate, the House of Representatives, and the Architect of the Capitol and any activities under the direction of the Architect of the Capitol)." *Id.* § 2901(14). District courts are therefore "agencies" under the FRA.

To simplify, the depositions in this case qualify as records if they were (1) made or received by the court, and (2) preserved by the court or appropriate for preservation because they are evidence of government performance or because they contain other information of value. The *Rohrbough* plaintiffs do not dispute

that the second requirement is met. As for the first requirement, the depositions were clearly not "made" by the court. That leaves the question whether the depositions were "received" by the court within the meaning of the statute.

There are no court decisions on this point, but NARA has promulgated a regulation defining what it means for material to be "received":

> Received means the acceptance or collection of documentary materials *by agency personnel* in the course of their official duties regardless of their origin (for example, other units of their agency, private citizens, public officials, other agencies, contractors, Government grantees) and regardless of how transmitted (in person or by messenger, mail, electronic means, or by any other method).

36 C.F.R. § 1222.12(b)(4) (emphasis added). The *Rohrbough* plaintiffs do not challenge the NARA regulation's interpretation of the FRA. Rather, they contend that no "agency personnel" ever accepted or collected the deposition transcripts.

The term "agency personnel" is undefined in the regulations. Undoubtedly, employees of the clerk's office would be "agency personnel" of a district court. Thus, documents filed with the clerk's office would be documents "[r]eceived . . . by agency personnel." Depositions, however, are not automatically filed with the court. Rule 5(d)(1) of the Federal Rules of Civil Procedure provides that depositions "must not be filed until they are used in the proceeding or the court orders filing." As the district court stated, the depositions at issue in this appeal were never "admitted as evidence nor cited, under seal or otherwise, in any

-10-

proceeding or pleading in either case." Taylor App. at 289. Consequently, they were never filed with the clerk of court, who thus never "received" them.

Likewise, we think it clear that district court "agency personnel" includes the judges of the court. If a judge makes a decision based on materials presented to him or her, even if the materials are not formally filed, they could be said to be "accepted" by agency personnel. In this case, however, it is undisputed that the judge never considered any of the depositions in rendering any decision before the dispute regarding disposal of the depositions.

Nevertheless, the depositions were required to be deposited with the special master, and he maintained custody over them (he was the only person with a key to the Evidence Room, and his presence was required for any inspection of materials produced under the protective order). The question then is whether the special master should be considered court personnel. We hold that he should. A special master occupies a special place in court proceedings, as indicated by Federal Rule of Civil Procedure 53, which governs in some detail the appointment and authority of special masters. The special master is more than an advisor or facilitator for the court. In the cases below, for example, he was granted all the powers provided by Rule 53. In particular, empowered to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district," Fed. R. Civ. P. 53(a)(1)(C), he was directed to rule on all discovery disputes in both cases. He was present when the

depositions were taken, and he made contemporaneous rulings on objections. His presence at depositions made it unnecessary for the parties to raise objections concerning the depositions with the magistrate judge or the district court, which would normally require submitting partial transcripts, rendering them "received" by the court. Indeed, in resolving disputes between the parties, he performed judicial functions. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36 (1993) (a quintessential characteristic of judging is the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." (internal quotation marks omitted)). In short, the special master was so intimately an arm of the court that he should be considered "agency personnel" for the purposes of the FRA. Because the depositions were deposited with him, they were "received" by the district court and are therefore records covered by the FRA.

The dissent raises several arguments not presented by the *Rohrbough* plaintiffs on appeal. The arguments are interesting ones but they do not persuade us to reverse.

First, the dissent faults us for relying on the definition of *records* in 44 U.S.C. § 3301 even though the record-preservation duty imposed on federal agencies by 44 U.S.C. § 3101 does not encompass everything defined as a record in § 3301. In particular, it points out that § 3101 requires agencies to "make and preserve" records "containing adequate and proper documentation of the

organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  Absent from § 3101 is any mention of those documentary materials that are *records* under § 3301 only "because of the informational value of data in them."  In other words, there is no record-preservation duty under § 3101 with respect to those documentary materials that are defined as records only because of their informational value.

This argument might be compelling if § 3101 were intended to establish the sole record-preservation duties of federal agencies.  But that is not the intent of the section.  Its clear purpose is to ensure that agencies *make* adequate records documenting its operations.  It also mandates, quite naturally, that the agencies then retain those records (else making them would be of little consequence).  It does not say, however, that if an agency makes other records or *receives* records that do not document agency operations, then the agency is free to dispose of them as it will.  Nor can we read § 3101 to imply such a limit on an agency's preservation responsibilities.  That implication would contradict the express language of 44 U.S.C. § 3314, which states that "[t]he procedures described by [chapter 33, which does not include § 3101] are exclusive, and records of the United States Government may not be alienated or destroyed except under [chapter 33]."  When chapter 33, entitled "Disposal of Records," imposes duties

with respect to records, it undoubtedly refers to *all* records defined by § 3301 of that chapter, not just the subset described in § 3101.

Moreover, we would be inclined to say that the depositions in this case come within the category of records described by § 3101. If the special master had been merely a custodian or guardian of the depositions, we might agree that they do not. But all the depositions were taken in his presence and he ruled on objections as they arose. If the depositions had been taken before a judge, there would be little doubt that they would document the "decisions, procedures, and essential transactions of the [court]." § 3101. When this role is delegated to special masters, who, as the dissent agrees, are "agency personnel," the same conclusion would seem to follow.

The dissent's second issue is that our opinion "interprets the FRA as throwing a wrench into discovery practice." Op. (Lucero, J. dissenting) at 15. It argues: "Today's decision potentially exposes any discovery deposited with a special master to public inspection. I cannot read a vague, broadly-worded statute directed toward public agencies as having such a profound effect." *Id.* at 15–16. But as the dissent apparently concedes, *id.* at 19–20, filed depositions are "records" subject to the records disposition schedule for the judiciary, *see* Guide to Judiciary Policies and Procedures, Vol. 13, ch. 17: Records Disposition Program and Records Disposition Schedules (2003) ("Judiciary Records Schedule"). And before 1980, which was well after the FRA took its present

-14-

form, all depositions had to be filed.  *See*, *e.g.*, Fed. R. Civ. P. 30(f) (1970) ("[The officer before whom the deposition was taken] shall then securely seal the deposition in an envelope indorsed with the title of the action . . . and shall promptly file it with the court . . . ."); Fed.R. Civ. P. 30 advisory committee's note to 1980 amendment of Rule 30(f)(1); Fed. R. Civ. P. 5 advisory committee's note to 1980 amendment of Rule 5(d).  Given that *every* deposition in a federal suit was a record subject to the FRA before 1980, it should not be cause for great concern about the impact on discovery if *some* depositions still are.  We also note that even for depositions taken after 1980, even when they are governed by a protective order, they certainly become records under the FRA when they are used at a trial or in a filed pleading; so no party can be totally confident that a deposition will not ultimately become such a record.

Finally, the dissent suggests that NARA and the Judicial Conference of the United States have indicated that depositions not filed or used by a judge are not governed by the FRA.  We disagree.  NARA's district-court brief did say that a deposition quoted or cited in a motion would be a record under the FRA; but it made clear that this was only one potential ground for its being a record.  NARA expressed no opinion on whether special masters can be court personnel or on the consequences that might follow from that categorization.  And it is hardly clear that the Judicial Conference retention schedule does not encompass the depositions in this case.  That schedule includes "records resulting from the

-15-

docketing and processing of a case in a court that pertains to that particular case."

Judiciary Records Schedule § 15(a). This phrase could be interpreted to include

an unfiled deposition that is otherwise a record. In any event, it would not be at

all surprising if some unusual circumstances, such as those in this case, had been

overlooked when the schedule was prepared. The regulations promulgated by

NARA contemplate that records will be scheduled in stages. *See* 36 C.F.R.

§ 1228.22 ("Ultimately, all records of an agency must be scheduled, but they need

not all be scheduled at the same time. An agency may schedule the records of

one function, program or organizational element at a time."). If a category of

records is overlooked in an agency's schedule, that category need not be

deformed to fit into an established category. The regulations recognize the

possibility that a record that is appropriate for preservation may not be addressed

in existing agency manuals. *See id.* § 1222-12(b)(6) ("*Appropriate for*

*preservation* means documentary materials made or received which in the

judgment of the agency should be filed, stored, or otherwise systematically

maintained by an agency because of the evidence of agency activities or

information they contain, *even though the materials may not be covered by its*

*current filing or maintenance procedures*."(emphasis added)). In such a

circumstance, determination of whether a document is a "record" under the FRA

must be based on the language of the governing statute and regulations, without

assistance from the agency's schedules.

## B.  Modification of Protective Order

Although the district court ordered that physical custody of the depositions be transferred to NARA, it continued to restrict access to them under its prior protective orders for 20 years.  NARA informed the district court that its practice is to allow the originating agency to determine access to the records while the agency retains legal (but not physical) custody of the records, which the court stated that it would do for 20 years.  Taylor appeals the court's decision not to modify the protective orders that applied to the depositions.  He contends that the court erred in finding that the interests favoring continued confidentiality outweighed the public's interest in the requested access to the depositions.

The modification of a protective order, like its original entry, is left to the sound discretion of the district court.  *See United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990).  Under Federal Rule of Civil Procedure 26(c), for "good cause" a court may issue a protective order regarding discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Such an order may forbid the disclosure of discovery, *see* Fed. R. Civ. P. 26(c)(1)(A), and require that depositions be sealed and opened only upon court order, *see id.* Rule 26(c)(1)(F).  The "good cause" standard of Rule 26(c) is "highly flexible, having been designed to accommodate all relevant interests as they arise."  *United States v. Microsoft Corp.*, 165 F.3d 952, 959 (D.C. Cir. 1999).

We are unable to review the district court's exercise of discretion, however, because the appellants have not provided us with the deposition transcripts that the court reviewed and relied on. Without these materials, we cannot properly evaluate certain factors, such as the presence of information that might encourage copycat incidents, whether the divulgence of the contents of the depositions would subject the Harrises and Klebolds to embarrassment or oppression, the extent to which the deposition testimony might have been given in reliance on the protective orders, or even the potential research interest of the testimony. "A party who seeks to reverse the decision of a district court must provide an adequate record for this court to determine that error was committed." *Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118, 1119 (10th Cir. 2003); *see also* 10th Cir. R. 10.3(A)–(B) ("Counsel must designate a record on appeal that is sufficient for considering and deciding the appellate issues," and "[t]he court need not remedy any failure by counsel to designate an adequate record."). We recognize that the record on appeal consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk," Fed. R. App. P. 10, and that the depositions were never filed below. Nevertheless, knowing that the district court had considered the contents of the depositions in deciding whether to modify the protective order, Taylor should have moved the district court to include the sealed depositions in the court record, so that we could

properly review the court's decision.[3] *Id.* at 10(e); *see also United States v. Andiarena*, 823 F.2d 673, 677 (1st Cir. 1987) (granting motion to supplement record to include evidence considered by jury); *see generally* Gregory A. Castanias & Robert H. Klonoff, Federal Appellate Practice and Procedure in a Nutshell §§ 3.4 (Extra-Record Facts), 9.1 (Composition and Supplementation of the Record on Appeal) (2008). Without those materials, we are obliged to affirm.

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.

---

[3]We note that Taylor, who is not a party to the *Rohrbough* case, has not moved to intervene in that case. The appropriate method for a third party to challenge a protective order is to intervene in the case. *See United Nuclear Corp.,* 905 F.2d at 1427. But in light of the inadequacy of the record, we need not decide whether this procedural flaw would be fatal to Taylor's appeal.

07-1186 and 07-1202, <u>Rohrbough v. Harris</u> and <u>Taylor v. Slovay Pharmaceuticals,</u> <u>Inc.</u>

**LUCERO**, J., dissenting.

I agree with my respected colleagues that special masters are "agency personnel" under the Federal Records Act ("FRA" or "Act"). But I disagree that unfiled depositions taken in private litigation fall within the ambit of the FRA. Neither Congress, the National Archives and Records Administration ("NARA"), nor the Administrative Office of the United States Courts understand the FRA to direct federal courts to transfer any discovery documents deposited with a special master to the National Archives. The majority's decision is contrary to the clear meaning of the FRA and, under the facts of this case, contrary to the expectations of parties litigating under the Federal Rules of Civil Procedure. Thus, I must respectfully dissent.

The FRA directs federal agencies to preserve records that document their "organization, functions, policies, decisions, procedures, and essential transactions." 44 U.S.C. § 3101. By doing so, agencies "document[] . . . the policies and transactions of the Federal Government." § 2902(1). Simply stated, the depositions of Wayne and Katherine Harris and Susan and Thomas Klebold do not document the organization, functions, policies, decisions, procedures, or essential transactions of the federal courts. In defining "record" without proper concern for the context provided by §§ 2902 and 3101, the majority's

interpretation of the statute is jarringly inconsistent with both the text and purpose of the FRA.[1]

In addition, the majority's interpretation thwarts the expectations of parties in discovery proceedings under the Federal Rules of Civil Procedure. Parties depose witnesses to obtain information and compile evidence in aid of litigation. They do not do so to create, nor did the parties here actually create, a historical record of the federal judiciary. When the depositions at issue were placed in the evidence room, that act alone did not create a federal record under the FRA. This expectation is common to private litigants and was confirmed by the protective orders entered by the court. Moreover, we should not assume that Congress intended to upset the reasonable expectations of litigants in the absence of a clear statement to the contrary.

**I**

**A**

As the FRA's text and structure specify, the role of agencies under the Act is to manage their own records, not to archive private documents, regardless of their historical value. Under the Act, agencies must ensure that they "make and

---

[1] The majority states that my dissent raises "several issues not presented by the Rohrbough plaintiffs on appeal." Maj. Op. at 12. To the contrary, the plaintiffs directly argue that the proper construction of the statute is "to ensure that adequate documentation of the agency's transactions is preserved," citing §§ 3101 and 2902. Aplts. Opening Br. at 7.

preserve" only those records that contain information regarding the government's "organization, functions, policies, decisions, procedures, and essential transactions," § 3101; see also Federal Records Act of 1950, Pub. L. No. 81-754, § 506(a), 64 Stat. 578, 586 (1950), none of which is implicated by the depositions in the case at bar. The majority lights upon the phrase "informational value," Maj. Op. at 9, which appears in the definition of "records" found at 44 U.S.C. § 3301 but is conspicuously absent from § 3101. By doing so, the majority expands the role of agencies to include the preservation of materials that do not document the government's organization, functions, policies, decisions, procedures, or essential transactions. This mistake contravenes the objective of the FRA: to "establish[] . . . standards and procedures to assure efficient and effective records management," § 2902, so that records of "the policies and transactions of the Federal Government" are accurate and complete, easily used, and judiciously created and preserved, see § 2902(1)–(6).

By relying solely on the definition of "records" in § 3301, the majority effectively excises important guidance regarding agencies' preservation duties. Section 3101 explicitly specifies which records are subject to these duties. Nonetheless, the majority reads the broader definition of "records" in § 3301 as controlling over the more specific preservation rule articulated in § 3101. This is contrary to accepted principles of statutory interpretation. See Gozlon-Peretz v. United States, 498 U.S. 395, 407 (1991) ("A specific provision controls over one

of more general application." (citation omitted)); <u>Franklin v. United States</u>, 992

F.2d 1492, 1502 (10th Cir. 1993) ("[A] specific statute . . . should not be deemed

controlled or nullified by a general statute . . . absent a definite contrary

intention.").

Following these principles, § 3101—not § 3301—serves as my analytical

starting point.  Section 3101 provides:

> The head of each Federal agency shall make and preserve records
> containing adequate and proper documentation of the organization,
> functions, policies, decisions, procedures, and essential transactions
> of the agency and designed to furnish the information necessary to
> protect the legal and financial rights of the Government and of
> persons directly affected by the agency's activities.

§ 3101.  I fail to see in this language a direction to the district courts to transfer

discovery in private litigation to the National Archives.  The depositions at issue

do not document the categories described.  In essence, the district court and the

majority read out all but the first eleven words of § 3101.  But it is the remainder

of § 3101 that establishes an agency's role under the FRA and answers the

question before us.

The majority exclusively relies on the definition in § 3301, which provides,

in relevant part:

> "[R]ecords" includes all . . . documentary materials . . . made or
> received by an agency of the United States Government under
> Federal law or in connection with the transaction of public business
> and preserved or appropriate for preservation by that agency or its
> legitimate successor as <u>evidence of the organization, functions,</u>

-4-

<u>policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them</u>.

§ 3301 (emphasis added). By taking a cut and paste approach, my colleagues conclude that the depositions at issue need not be "evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government," <u>id.</u>, because of their conclusion that a document may also qualify as a record if it contains data with "informational value." Maj. Op. at 9 ("[T]he depositions in this case qualify as records if they were (1) made or received by the court, and (2) preserved by the court or appropriate for preservation because they are evidence of government performance <u>or</u> because they contain other information of value." (emphasis added)). The district court similarly interpreted this clause to expand the role of an agency to include the preservation of records which merely have "informational value," despite the express guidance in § 3101 that each agency "shall make and preserve" only those which "contain[] adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency," § 3101. <u>See</u> Apr. 2, 2007 Order, <u>Rohrbough v. Harris</u>, No. 00-cv-00808-LTB-PAC, 2007 WL 987848, at *4 (D. Colo. Apr. 2, 2007) ("I conclude that the materials relating to the depositions . . . fall within the definition of records under the FRA. These materials were received and stored by the Court, and <u>they are of significant historical value</u>." (emphasis added)).

-5-

I cannot agree with this interpretation. In § 3101, Congress explicitly addressed what records agencies should "make and preserve" and excluded the informational value clause present in § 3301.[2] The broad definition of "records" analyzed by the majority appears in the chapter entitled "Disposal of Records." 44 U.S.C. ch. 33. This context illuminates the meaning of the term "informational value": it allows for the preservation of materials that would otherwise be disposed of because they <u>no longer</u> document "the organization, functions, policies, decisions, procedures, operations or other activities of the Government." § 3101. This permits the preservation of records that are valuable because they document an agency's history. Section 3303(2) confirms this. It directs each agency head to submit to the Archivist lists of records that may be disposed of, as they are "not needed by [the agency] in the transaction of its <u>current</u> business <u>and</u> . . . do not appear to have sufficient administrative, legal, research, or other value to warrant their further preservation." § 3303(2) (emphasis added). This provision plainly corresponds to the "informational value" provision in § 3301, and allows for an exception to the <u>disposal</u> of such

_____

[2] The original Federal Records Act of 1950 confirms that the contrast between the duties of agencies in § 3101 and the definition of "records" in § 3301 was intentional. Congress included the definition of the word "records," containing the "informational value" clause, in the 1950 Act. Federal Records Act of 1950, Pub. L. No. 81-754, § 511(a), 64 Stat. 578, 589 (1950). In the same bill, Congress expressly spelled out the duties of agencies under the FRA but excluded the "informational value" clause. § 506 (now codified as 44 U.S.C. § 3101). Today's statute continues to reflect this distinction.

-6-

records if they warrant further preservation once they cease to describe current agency activities.

Viewing the statutory scheme as a whole, an agency must <u>originally</u> preserve records only because they document its organization, functions, policies, decisions, procedures, and essential transactions—not merely because they have "informational value."[3]  Accordingly, this term is excluded from § 3101.   By importing "informational value" into this context, the majority creates an artificial conflict between § 3101 and § 3301 and then allows the more general provision—§ 3301—to control.

The majority agrees that my interpretation "might be compelling if § 3101 were intended to establish the sole record-preservation duties of federal agencies."  Maj. Op. at 13.  Precisely because § 3101 <u>is</u> the sole section establishing agencies' preservation duties, I read the statute to compel this conclusion.  Section 3101 does not, as the majority implies, govern only records created by the agency.  The majority claims that the "clear purpose" of § 3101 is to "ensure that agencies <u>make</u> adequate records," Maj. Op. at 13, and the section "mandates" that agencies "then retain <u>those</u> records," <u>id.</u> (emphasis added).  Such

---

[3] The majority asserts that it is "not dispute[d] that the [historical value] requirement is met."  Maj. Op. at 10.  This may be so, but as noted <u>supra</u> n.1, the issue of whether records which have historical value, yet do not document government activity, fall within the FRA in the first place <u>is</u> squarely before us. <u>See</u> Aplts. Opening Br. at 7.

a reading does not interpret the text but rewrites it. The actual text, "[t]he head of each Federal agency shall make and preserve records," § 3101 (emphasis added), does not limit its preservation "mandate" to only those records an agency "makes." The plain text of § 3101 requires an agency to preserve records containing "documentation of [its] organization, functions, policies, decisions, procedures, and essential transactions" whether it made or received them. If there were any ambiguity in this text, my reading is confirmed by the title of the section: "Records management by agency heads; general duties." § 3101 (emphasis added); see Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 483 (2001) ("[T]he interpretive role of the title" is to "shed light on some ambiguous word or phrase in the statute itself." (quotation and alteration omitted)). Section 3101 establishes the complete and sole record creation and record preservation duties of federal agencies.

The majority further claims that 44 U.S.C. § 3314 establishes a preservation duty outside of § 3101 because it provides that "the procedures prescribed by [Chapter 33] are exclusive, and records of the United States Government may not be alienated or destroyed except under this chapter." But the majority's belief that § 3314 establishes a duty to preserve in addition to the duties established in § 3101 presupposes its own conclusion. Section 3314 only controls the disposal of the depositions if they are federal records. If they are not federal records, § 3314 does not apply to them. Thus, only by assuming that

-8-

these unsigned, unfiled depositions are federal records can the majority possibly rely on § 3314. Because I do not assume this conclusion, § 3314 does not establish a preservation duty. Those duties are established solely by § 3101.

**B**

The genesis of the FRA was President Truman's Executive Order No. 9784. See S. Rep. No. 81-2140, at 3547 (1950). Its purpose was "to provide that Government records may be utilized to maximum advantage and disposed of expeditiously when no longer needed and in the interest of more efficient internal management of the Government." Exec. Order No. 9784, 11 Fed. Reg. 10909 (Sept. 27, 1946). The majority's interpretation of the FRA not only ignores this focus on efficient disposal, reflected in § 3301, it contradicts it; under the majority's approach, agencies must retain more, not less, of the paper that crosses their desks.

In 1976, Congress found that:

> Because of the new utilization by the government since 1950 of advanced technologies . . . the records production process has been speeded up . . . . [T]he amount of paper flowing into the government each year fills four and a half million cubic feet of space and . . . the costs to the taxpayer of handling and managing such a mountain of paper exceed $8 billion a year.

S. Rep. 94-1326, at 2–3 (1976). Congress decided it was necessary to add Chapter 29, codifying the objectives of the FRA at 44 U.S.C. § 2902, to "provide a clear expression of Congressional intent to the heads of Federal departments and

agencies on the necessity to place more emphasis on records management programs aimed at providing essential, accurate recorded information in the needed format and time frame to enable agencies to perform their functions effectively and efficiently." S. Rep. 94-1326, at 3.

Certainly, Congress was not oblivious to the possibility that records might have historical value, but it created a separate body, the National Historical Publications Commission (now the National Historical Publications and Records Commission), the appointed members of which are all historians, to preserve those with such value. Federal Records Act of 1950 § 503(a) (now codified as 44 U.S.C. § 2501(a)(2)). Notably, the Commission's mandate is far broader than the duties of federal agencies that fall within the ambit of the FRA. The Commission is directed to "cooperate" with "State . . . and local agencies and nongovernmental institutions, societies, and individuals" and may "edit[] and publish[] papers of outstanding citizens of the United States, and other documents as may be important for an understanding and appreciation of the history of the United States." § 2504(b).

Seen in context, the number of documents "made or received" by agency personnel is orders of magnitude greater than it was in 1976. Following the direction of Congress, I understand the FRA to restrict which records an agency preserves to only those that "contain[] adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions

-10-

of the agency." § 3101. The majority, on the other hand, has decided to <u>expand</u> its scope.

C

The operative question is whether the unfiled, unsigned depositions of Wayne and Katherine Harris and Susan and Thomas Klebold document "the organization, functions, policies, decisions, procedures, and essential transactions of the agency." The majority errs in failing to answer that question before addressing whether the depositions were "made or received" by the special master, which appears to be the focus of their analysis. Maj. Op. at 10–12.

### 1. "Organization"

The organization of the federal judiciary was not at issue in the appellants' lawsuit. In the context of the federal judiciary, organizational records might document the structure of the lower courts, clerks' offices, and judicial staff.[4] This lawsuit does implicate the structure and management of the courts. Although the depositions themselves are not before us, it is hard to imagine how the testimony of the parents of the Columbine shooters could document the manner in which the federal courts are organized.

---

[4] This list, along with the others in this section, contains only illustrative examples of what falls within each category enumerated in § 3101 as applied to the federal courts, and is not intended to be exhaustive.

## 2. "Functions"

The primary function of the federal judiciary is to decide cases and controversies. <u>See</u> U.S. Const. art. III, § 2. To achieve that primary function, the judiciary also has subsidiary functions such as resolving motions. Records describing the contours of these responsibilities or assigning them to court personnel would document the functions of the judiciary. For example, the protective order in this case is such a record because it appoints and describes the functions of the special master. Depositions of the private parties litigating this case, which were never filed nor were their contents considered by the court, do not document a judicial function.

## 3. "Policies"

A "policy" is "a definite course or method of action selected . . . to guide and usually determine present and future decisions." Webster's Third New International Dictionary (Unabridged) 1754 (1993). The Administrative Office of the United States Courts documents the policies of federal courts in its Guide to Judiciary Policies and Procedures. Further policies are documented in each court's local rules. To consider the Harris and Klebold depositions to constitute records that "guide and . . . determine present and future decisions" of the federal courts strains credulity.

-12-

## 4. "Decisions"

The decisions of a federal court, unlike its organization, functions, or policies, may well turn on evidence produced in discovery. Motions for summary judgment, for example, rely on supporting exhibits such as depositions, even if the exhibits are not admitted at trial. Depositions used to resolve such motions could be said to document the decision of a court. Here, however, the contents of the Harris and Klebold depositions were never examined by the court and did not serve as the basis for any judicial decision. They were held in the evidence room simply as a consequence of the protective order, which required that "[d]epositions requiring the use of non-public protected documents shall be conducted at the Courthouse in the presence of the Special Master" (quotation omitted). Indeed, it would have been improper for the court to base a decision on their contents, as they were unsigned and never filed with the court. See Fed. R. Civ. P. 5(d)(1), 26(g). Consequently, the Harris and Klebold depositions do not document the decisions of any federal court.

## 5. "Procedures"

The procedures of the federal courts are closely related to their policies and are often similarly documented. Along with the Guide to Judiciary Policies and Procedures, courts' procedures are also documented in their rules, such as the Federal Rules of Civil Procedure, the Federal Rules of Appellate Procedure, the Supreme Court rules, circuit rules, and other local rules. In a case challenging

such procedural rules, depositions that a court substantively considers and relies on may arguably document its procedures.  Because the Harris and Klebold depositions are not related to a challenge to any judicial procedure and the court never considered their contents, they do not document the procedures of the federal courts.

### 6. "Essential Transactions"

Finally, I turn to whether the depositions document the "essential transactions" of the judiciary.  Essential transactions in a judicial context include receiving pleadings and documents filed with or presented as evidence to the Court (the "case file"), holding hearings and trials, entering orders, and issuing opinions.  Accordingly, the majority is correct that documents filed with the clerk's office are federal records.  Maj. Op. at 10–11.  In contrast, unsigned depositions cannot be filed.  See Fed. R. Civ. P. 5(d)(1), 26(g); Maj. Op. at 11.  Therefore, the Harris and Klebold depositions could not possibly document an essential transaction of the court because they were neither filed with the clerk's office, used at a hearing or trial, nor were their contents relied upon by a judge.[5]

---

[5] The majority states that it "would be inclined to say that the depositions in this case come within the category of records described by § 3101" because "the depositions were taken in [the special master's] presence and he ruled on objections as they arose."  Maj. Op. at 14.  As discussed, supra §§ I.C.4 and I.C.6, the special master's presence alone does not make these depositions federal records.  Whether the special master "ruled on objections as they arose" is a question of fact the district court did not address, and which does not appear in the briefing.  The only point at which any party before this court argued that the

(continued...)

-14-

Because the depositions of Wayne and Katherine Harris and Susan and Thomas Klebold do not fall within any of the above categories, they do not fall within the ambit of the FRA.  § 3101.  It is unnecessary to reach whether they were "made or received" by the court.[6]

**II**

**A**

Beyond misinterpreting the statute, the majority's conclusion interprets the FRA as throwing a wrench into discovery practice.  The Federal Rules of Civil Procedure explicitly and precisely address how discovery materials are collected and used.  See Fed. R. Civ. P. 26–36.[7]  Today's decision potentially exposes any

---

[5](...continued)
special master ruled on objections came at oral argument, when counsel for the Harrises responded in the affirmative to the question of whether the special master "made rulings."  My interpretation relies on the text and structure of the statute, which was plainly misapplied by the district court.  Unlike the majority, I will not make this non-record-supported factual finding on appeal.

[6] Because materials including in a filing with the court document an "essential transaction," if the appellants had filed the deposition transcripts as a part of the record on appeal, their appeal would have been self-defeating.

[7] Fed. R. Civ. P. 26 (mandatory discovery obligations, scope and timing of discovery, supplementary disclosures, mandatory discovery conference, and signature requirement), 27 (perpetuated testimony), 28 (who must witness a deposition), 29 (stipulations in discovery practice), 30 (timing of oral depositions, written notice requirements, providing for production of documents via subpoena duces tecum, format of questioning, objection process during depositions, duration of depositions, certification requirements, and sanctions), 31 (procedure for taking written deposition), 32 (use of depositions in hearing or trial), 33 (interrogatories), 34 (production of documents or other electronic or tangible

(continued...)

discovery deposited with a special master to public inspection. I cannot read a vague, broadly-worded statute directed toward public agencies as having such a profound effect. See Canup v. Chipman-Union, Inc., 123 F.3d 1440, 1443 (11th Cir. 1997) ("We would expect Congress to speak more clearly if it intended such a radical change in the application and understanding of its . . . statutes."); In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1382 (5th Cir. 1986) ("We think it unlikely that Congress would have adopted such a rule—entailing, as it does, major changes in the way in which a reorganization proceeding is conducted—without clear, unequivocal statements to that effect in the bankruptcy statute or, at the least, in its legislative history."); Flynn v. U.S. ex rel. Eggers, 786 F.2d 586, 591 (3d Cir. 1986) ("[W]e are mindful of the Supreme Court's admonition that, absent a clear Congressional statement, we should not infer that Congress intended to alter equity practices.").[8]

---

[7](...continued) items), 35 (physical and mental examinations), 36 (scope and effect of requests for admission).

[8] The majority asserts:

[B]efore 1980, which was well after the FRA took its present form, all depositions had to be filed. See, e.g., Fed. R. Civ. P. 30(f) (1970) ("[The officer before whom the deposition was taken] shall then securely seal the deposition in an envelope indorsed with the title of the action . . . and shall promptly file it with the court . . . .") . . . . Given that every deposition in a federal suit was a record subject to the FRA before 1980, it should not be cause for great concern about the impact on discovery if some depositions still are.

(continued...)

-16-

By holding that any document that passes through the hands of a special master may be transferred to the National Archives, the majority adds a new and unexpected variable into the calculus of litigation discovery. Until today, parties could confidently follow the Supreme Court's command that "deposition-discovery rules are to be accorded a broad and liberal treatment," Hickman v. Taylor, 329 U.S. 495, 507 (1947), safe in the knowledge that objectionable questions and answers would not be admitted at trial, see Fed. R. Civ. P. 30(c), and, if necessary, would be sealed for "good cause shown," Fed. R. Civ. P. 26(c). In other words, taking or sitting for a deposition was confined to a particular lawsuit. No longer is this the case.

**B**

In addition to the broad expectations that the Federal Rules of Civil Procedure create, the district court below adhered to those rules and created specific expectations regarding the disclosure of discovery by entering several

---

[8](...continued)

Maj. Op. at 14-15 (additional citations omitted). The majority fails to recognize that before the filing required by the 1970 version of Rule 30(f), depositions had to be "fully transcribed," "submitted to the witness for examination," and "then be signed by the witness [or the officer before whom the deposition was taken, in certain circumstances]." Fed. R. Civ. P. 30(e) (1970); see also Fed. R. Civ. P. 30(e) (1979) (same); Fed. R. Civ. P. 30(e) (1950) (same). The deposition transcripts at issue in this case were never signed, and the record is disputed as to how many depositions, if any, were even transcribed. It is apparent that the Federal Rules have always prohibited filing unsigned depositions, such as those at issue in this case.

protective orders.  See Fed. R. Civ. P. 26(c).  The earliest protective order, issued on January 8, 2002, stated, "Promptly after the termination of this action . . ., all Protected Documents, Confidential Information, and copies of deposition transcripts designated as confidential . . . shall be returned to counsel for the party producing those confidential materials."  The final, consolidated protective order of April 25, 2003, in effect when Wayne and Katherine Harris and Susan and Thomas Klebold were deposed, and when the case was settled in August, provides that "[a]t the conclusion of this litigation, all documents and materials deposited in the Evidence Room pursuant to this Consolidated Protective Order shall be returned to the producing party, entity, or person or the appropriate custodian of any such documents and materials."  All parties to the litigation properly shared an understanding—confirmed by the court—that all confidential discovery would be returned to the producing parties.

The Attorney General of Colorado upset the apple cart with its September 23, 2003, motion to intervene.  Although intervention was denied, the Attorney General was permitted to participate as amicus, primarily to address his concern that an expert in youth violence should be allowed access to the records.  Regardless of the legitimacy of this interest, it was never embraced by the parties to this appeal nor is there any other reason they would have anticipated it when the depositions were taken.

**C**

Because of the expectations created by the Federal Rules of Civil Procedure and the court's protective orders pursuant to the Rules, it is extremely unlikely that the parties ever considered that their depositions might be redirected to the National Archives. Moreover, although the National Archives contain depositions, see The National Archives, Archival Research Catalog, http://www.archives.gov/research/arc/ (search for "deposition") (last visited Oct. 10, 2008), these are from congressional hearings, executive investigations, cases where the United States or an officer thereof was a party, or cases raising issues of historical importance. E.g., National Archives, Archival Research Catalog, http://arcweb.archives.gov/ (search "Reagan and Poindexter") (last visited Oct. 10, 2008) (deposition of Ronald Reagan in U.S. v. Poindexter); National Archives, Archival Research Catalog, http://arcweb.archives.gov/ (search "Stowe and Thomas") (last visited Oct. 10, 2008) (deposition of Harriet Beecher Stowe in Stowe v. Thomas, 1 Pitts. 82, 23 F. Cas. 201 (1853)). Although the last category includes depositions taken in private litigation, the Archives contain only depositions that were actually part of the case file.[9]

---

[9] See, e.g., National Archives, Archival Research Catalog, http://arcweb.archives.gov/ (search "Stowe and Thomas") (last visited Oct. 10, 2008) (noting that "[t]he case file from which these documents originate is also referenced as Stowe versus Thomas, Case #9 October Session 1853" (emphasis added)).

The Administrative Office's schedules do not contemplate archiving unfiled depositions, confirming that it shares the parties' expectations regarding the scope of the FRA.  See Admin. Office of the U.S. Courts, The Guide to Judiciary Policies and Procedures, vol. 1, ch. 12, pt. A, §§ 14-15, Record Management Policies (2002), available at http://jnet.ao.dcn/Guide/Volume_1/Chapter_12/Part_A.html (scheduling the disposal of "Case Records" and "Case-Associated Records").  Records Disposition Schedule 2 describes "Case Records" as "[a]ll records resulting from the docketing and processing of a case in a court that pertain to that particular case."  Id. § 15(A) (emphasis added).  Similarly, NARA, in its briefing to the district court, explained that "[t]here is no way for [it] to know whether any materials in the Evidence Room were quoted or cited in any motions or other papers . . . .  As a result, it remains unclear at this time whether any of those materials were 'used' in the cases and thus should be considered 'records' subject to the FRA."  As the majority acknowledges, these depositions were never "used" by the court, Maj. Op. at 11, and thus NARA's reasoning confirms that they are not records subject to the FRA.

In all litigation, parties should be on notice of the extent to which discovery may become public.  The Federal Rules of Civil Procedure anticipate and expressly address these concerns, creating justified expectations.  See Fed. R. Civ. P. 26(c), 30(c).  The majority assumes that Congress steamrolled over these

detailed and specific rules with a statute covering all federal agencies that never once mentions litigation. Absent a clear statement of Congressional intent to dramatically alter civil discovery practice, I cannot agree with my colleagues that the depositions in this case are records subject to transfer to the National Archives.

### III

Because my reading of the FRA directs the district court to preserve only those records that document the federal courts' organization, functions, policies, decisions, procedures, and essential transactions, I cannot agree with the majority that the Act covers the unfiled, unsigned depositions of Wayne and Katherine Harris and Susan and Thomas Klebold. I respectfully dissent.